# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| In the matter of the Estate of RICHARD L. DEGROAT, deceased. | ) ) ) | |
| R. MICHAEL DEGROAT, Individually and as Executor of the Estate of Richard L. DeGroat, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| and | ) ) | |
| CARROLL IACOVETTI and JAN DEGROAT, | ) ) ) | C.A. No. 12738-VCZ |
| Plaintiff-Intervenors, | ) ) ) | |
| v. | ) ) | |
| LUCINDA A. PAPA a/k/a LUCINDA M. PAPA a/k/a LUCINDA P. DEGROAT a/k/a LUCINDA A. ZIATYK and MICHAEL ZIATYK, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 14, 2020
Date Decided: April 30, 2020

David J. Ferry, Jr. and Brian J. Ferry, FERRY JOSEPH, P.A., Wilmington, Delaware, *Attorneys for Plaintiff and Plaintiff-Intervenors R. Michael DeGroat, Carroll Iacovetti, and Jan DeGroat.*

Jason C. Powell, THE POWELL FIRM, LLC, Wilmington, Delaware, *Attorney for Defendants Lucinda A. Papa and Michael Ziatyk.*

**ZURN, Vice Chancellor.**

The children and first ex-wife of Richard DeGroat, who is deceased, contend that his second ex-wife, Lucinda Papa, misappropriated his assets during his life and upon his death.[1] In his final years, and years after their divorce, Richard willingly sought Lucinda's help with his affairs and her companionship. Although the two had not been in touch for a number of years, the role seemed fitting, as Lucinda has substantial business experience and Richard was not close to his family. Instead of honoring this relationship and the trust Richard instilled in her, Lucinda took advantage of the opportunity to take his assets. This post-trial opinion concludes that Richard needed and accepted Lucinda's help with his finances, but that Richard did not intend to give all of his assets to Lucinda. Rather, Lucinda used her access to Richard's assets to improperly take them for herself.

## I.    BACKGROUND

Richard was a very intelligent and well-read man who followed financial news and was active in managing his assets.[2] He was stubborn and not easily

---

[1] In this family dispute, I use the parties' first names in pursuit of clarity. I intend no familiarity or disrespect. Citations in the form of "[Name] Tr. —" refer to witness testimony from the trial transcripts. Citations in the form of "[Name] Dep. —" refer to deposition transcripts in the record. Citations in the form of "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Docket Item ("D.I.") 218. Citations in the form of "JX — at —" refer to a trial exhibit.

[2] Papa Tr. 810:7–10; Tavani Tr. 192:21–193:5, R. M. DeGroat 463:7–14; A. J. DeGroat 578:5–9; G. R. Spritz 327:13–17.

persuaded.[3]  Lucinda is also very intelligent, with a keen mind for business and entrepreneurship.  She holds a bachelor's degree in economics, has worked in audit management, and has practiced as a certified public accountant.[4]  Lucinda, too, is stubborn:  she wanted more of Richard's assets than she received out of her divorce, and engaged in a persistent course of conduct to obtain them.  Lucinda's testimony concerning the financial agreements she and Richard purportedly reached, and the manner in which she managed Richard's affairs, is contradictory and unsubstantiated by any contemporaneous evidence.  Lucinda's credibility leaves much to be desired.

### A.    Richard's Two Marriages, Children, And Two Divorces.

Richard married plaintiff Jan DeGroat in 1954, had five children with her, and divorced her in 1978.[5]  Richard and Jan's children are plaintiff R. Michael DeGroat, Thomas DeGroat, plaintiff Carroll Iacovetti, Brian DeGroat, and Andrew DeGroat.[6]  In that divorce, Richard was represented by counsel, and the couple executed a written divorce agreement.[7]

---

[3] Papa Tr. 961:7–10; Iacovetti Tr. 747:15–17.

[4] Papa Tr. 807:13–808:9, 943:18–20.

[5] PTO ¶ 2 at 1–3.

[6] J. DeGroat Tr. 771:8–13.

[7] J. DeGroat Tr. 771:21–773:14.

On September 9, 1978, Richard married defendant Lucinda Papa, who was twenty-one years his junior.[8]  When they married, Richard's earning potential was declining, while Lucinda's was rising.[9]  In fact, Richard stopped working altogether, while Lucinda worked hard and grew a successful women's clothing company.[10]  During their marriage, Lucinda and Richard agreed that Lucinda would fund all of their expenditures and taxable savings with her earnings, while their retirements would be funded by Richard's growing tax-deferred savings.[11]  In 2001, Lucinda and Richard purchased 3 Somerset Lane, Newark, Delaware 19711 (the "Property") as tenants by the entirety.[12]  Lucinda's relationships with Richard's children were cordial and positive.[13]

In both of his marriages, Richard was stubborn and abusive.[14]  Richard and Lucinda separated in 2000, reconciled, and separated again in 2004.[15]  Richard and Lucinda divorced on July 25, 2008.[16]  There is no written divorce agreement or

---

[8] PTO ¶ 2 at 4–5.

[9] Papa Tr. 812:9–813:21, 819:3–13.

[10] Papa Tr. 813:22–814:16, 818:2–10, 819:3–4.

[11] Papa Tr. 817:4–22.

[12] Papa Tr. 827:13–18.

[13] Papa Tr. 834:2–835:19.

[14] J. DeGroat Tr. 771:23–772:1; Papa Tr. 821:13–20, 823:22–826:18, 845:8–14.

[15] R. M. DeGroat Tr. 375:16–18, 376:18–21; Papa Tr. 823:22–826:18, 828:6–20.

[16] PTO ¶ 2 at 6.

property division from their divorce.[17] According to Lucinda, she and Richard maintained their marital financial agreement, by which Richard would retain her as the beneficiary of his retirement assets, after the divorce.[18] This agreement was not documented, and I do not believe it existed.[19] The evidence shows that at the time of their divorce, Richard and Lucinda agreed to remove each other as beneficiaries on their Vanguard accounts.[20] Richard also removed Lucinda as the beneficiary to his Penn Mutual and Lincoln Financial Group life insurance policies in 2007.[21] Richard made Jan the primary beneficiary on his Vanguard Individual Retirement

---

[17] Papa Tr. 955:21–957:20.

[18] Papa Tr. 817:4–22, 830:10–18, 886:12–887:3.

[19] *See* JX 35; Papa Tr. 955:21–957:20. The only evidence Lucinda offers to support her purported agreement with Richard is his December 15, 2011, call with Vanguard. That evidence refutes the terms of the purported agreement. In that call, Richard was attempting to remove Lucinda's name from his accounts, and he references their 2007 divorce. JX 18 at 77 ("And it's mentioned in the divorce papers that the – there was no money amount transferred or one with the divorce, but the divorce papers indicate that the – that the financial arrangements were all not part of the divorce. The divorce says that they were agreed upon by the parties in the divorce. So that's – that's all I – that's all I have. But, see, nothing does me any good if I can't locate the party that's on the – you know, the account. And I'm afraid she's – I'm afraid, if her name is here, she can withdraw anything that's in that account."). This call does not evidence the terms of any divorce agreement, and indeed, Richard was trying to remove Lucinda from his accounts, counter to the terms of the agreement Lucinda seeks to prove. And in 2012, Richard continued to try to protect his assets from Lucinda, again while referencing his divorce. JX 23 at 138–39 ("And I'm trying to remove a person -- an ex-wife, really. And make sure that she has no way of getting her hands on any money that's in those funds. We're divorced and we had an agreement -- not part of the divorce, but a -- the divorce mentions a -- that we have -- we being my ex-wife and myself. A financial agreement, which we do. But now I'm trying to make sure that there's no way she can go back and grab money in any of these funds.").

[20] *See* JX 2; JX 3; JX 4; JX 18 at 77; JX 23 at 138–39.

[21] JX 6; JX 7.

Accounts ("IRA"), and made Carroll the secondary.[22]  Later, Richard made

Carroll, rather than Jan, the primary and sole beneficiary on the Vanguard IRAs.[23]

At the time of his divorce, Richard transferred approximately $720,000 to

Lucinda.[24]  He also paid her $42,000, representing the value of Exxon stock that

Richard held.[25]

Lucinda further contends that in 2013, she and Richard renewed or restated

their purported divorce agreement in a "verbal reallocation agreement" (the "2013

Verbal Agreement").[26]  Lucinda testified that she and Richard entered into this

agreement during dinner on the night of January 29, the same day Lucinda and

Richard executed a new deed for the Property.[27]  Lucinda testified that Richard

expressed his belief that their 2008 divorce agreement was not equitable and that

she should receive an additional $300,000 payment from his taxable assets.[28]

Lucinda explained that to implement the 2013 Verbal Agreement, Richard would

transfer money to their joint account from his individual accounts and IRAs as a

---

[22] JX 1 at VGI 1356, 11358, 1360, 1362, 1371; JX 11 at 5–8.

[23] JX 1 at VGI 1364, 1373; JX 17 at 62–65.  Richard later mentioned wanting to remove Carroll as a beneficiary to this account, but he wished to do so because he was going to give her money under his will.  JX 21 at 97–98 ("I'm going to take her off there and switch her over to the new terms of the will, which will give her more money.).

[24] JX 3; JX 4; JX 18 at 77; JX 23 at 138–39.

[25] JX 3; JX 4 at VGI 0995.

[26] Papa Tr. 1026:5–1030:23.

[27] Papa Tr. 1026:5–1030:23.

[28] Papa Tr. 902:16–904:15, 988:1–4, 1026:5–1030:23.

signal that Lucinda could take money from the account for her own use.[29]  This testimony is refuted by documents showing Lucinda transferred funds into the joint account herself, as well as the fact that such purported signaling transfers continued after Richard was hospitalized.[30]  Lucinda has failed to prove that she and Richard agreed, either at the time of their divorce or in the 2013 Verbal Agreement, that she would receive all of his retirement accounts and an additional payment after their divorce and his death.

According to Lucinda, in late 2004, she and Richard began discussing whether Richard should move to an apartment in an independent living community, at which time they would sell the Property and split the proceeds.[31]  Lucinda testified that Richard placed a deposit on an apartment at Maris Grove, a retirement community, and that the couple then agreed to sell the Property and split the proceeds.[32]  In fact, even though Richard had put down a deposit for the

---

[29] Papa Tr. 903:19–904:16, 1041:4–10 ("From [the joint account], I will take checks, which I may write at any time I wish, for whatever I wish.").

[30] D.I. 272 at VGI 4876, 4878, 4880, 4882, 4886, 4890.  In a call to Vanguard in March 2013, Lucinda was surprised to find out that Richard had not closed their Vanguard Joint Account. JX44 at 246-247.  This evidence is contrary to her testimony that the Vanguard Joint Account would be used as part of the 2013 Verbal Agreement, which was agreed to in January 2013.  Papa Tr. 903:19–904:16.

[31] Papa Tr. 828:6–20, 868:20–869:15, 971:10-972:19, 990:9–18, 1132:5–17.

[32] Papa Tr. 828:6–20, 868:20–869:15, 971:10-972:19, 990:9–18, 1132:5–17.  Lucinda testified that the Property was appraised in late 2005 or early 2006 at $525,000.  Based on the alleged agreement to split the Property sale proceeds, Lucinda believed she and Richard would each receive $250,000.  JX 113 at 6.  Lucinda has failed to prove this agreement existed.

6

apartment at Maris Grove, Richard continued to live alone at the Property.[33] The

divorce caused Lucinda and Richard's interests in the Property to shift to a tenancy

in common, such that neither party had a right of survivorship.[34] The house

deteriorated and lost value under Richard's sole management.[35]

As adults, Richard's children were not particularly close to him, even though

they all lived within an hour's drive; phone calls and visits were sporadic or

nonexistent.[36] Michael was the child closest to Richard and only saw him two to

three times a year.[37] Richard did not discuss his divorce from Lucinda, any

property division terms, or his assets and estate plan with his children.[38] Richard

and Jan did not frequently speak.[39]

---

[33] Papa Tr. 828:6–20.

[34] *Real Estate of Dillard M. v. Elva Wells*, 2007 WL 2493688, at *1 (Del. Ch. Aug. 15, 2007) (providing that upon divorce, "by operation of law the former tenancy by the entireties devolved into a tenancy in common").

[35] Tavani Tr. 138:15–17; R. M. DeGroat Tr. 391:4–6, 402:6–11.

[36] Iacovetti Tr. 743:9–745:16; A. J. DeGroat Tr. 602:24–604:21; Eastburn Tr. 1200:9–1201:3; Papa Tr. 820:22–821:2; R. M. DeGroat Tr. 448:12–452:20.

[37] R. M. DeGroat Tr. 448:12–452:20.

[38] R. M. DeGroat Tr. 376:22–377:22, 404:20–405:13, 464:22–465:3, 471:17–19; A. J. DeGroat Tr. 580:8–21, 603:3–6; Iacovetti Tr. 734:16–19, 742:4–743:8, 752:1–24.

[39] J. DeGroat Tr. 787:2–6, 788:24–789:4, 793:1–794:6, 799:11–14; Iacovetti Tr. 745:5–755:1; Papa Tr. 1145:8–22.

### B. Richard And Lucinda Move On.

In May 2009, Lucinda married Michael Ziatyk.[40] She did not inform Richard.[41] After marrying, Lucinda and Ziatyk initially split time between Ziatyk's apartment in Tuxedo Park, New York, and Lucinda's apartment in Wilmington.[42] On March 9, 2012, Lucinda and Ziatyk paid $560,000 in cash for a historic house in Massachusetts.[43] Ziatyk renovated the property, and the couple sold it for $1,050,000 on June 3, 2018.[44] Lucinda and Ziatyk now live in Landrum, South Carolina.[45]

As of late 2011, Richard was suspicious that Lucinda was going to try to obtain more money from him.[46] He began attempting to remove her as the beneficiary of his Vanguard Transfer on Death Accounts ("Vanguard TODs"),[47] and to remove her as an owner on their Prime Money Market Fund joint account

---

[40] PTO ¶ 2 at 7.

[41] R. M. DeGroat Tr. 382:4–11.

[42] Papa Tr. 835:22–836:6.

[43] Papa Tr. 836:9–837:16.

[44] Papa Tr. 837:1–11, 839:1–7.

[45] Papa Tr. 839:8–11.

[46] JX 23 at 138–140, 146; R. M. DeGroat Tr. 378:2–379:11, 380:15–23, 383:2–5; JX 22; JX 27. Lucinda admits to contacting Richard in 2011 via a note. She testified, "I thought he was going to be selling the house, so I carried his telephone on the company business up until MCI went bankrupt... I sent him a note and said 'Call Verizon. You'll need to have this billed to your address because of the phone.'" Papa Tr. 840:14–22.

[47] These accounts included two individual accounts, a Prime Money Market Fund account, and a GNMA Fund Investor account. *See* JX 1 at VGI 1355.

("Vanguard Joint Account").[48]   Richard did not have a computer,[49] so he called

Vanguard to discuss his accounts and the changes he would like made to them.[50]

Richard frequently called Vanguard from 2010 through 2012, resulting in a trial

record containing over fifteen audio recordings, many of which were played at trial

and transcribed.[51]   These recordings evidence Richard's desire to remove Lucinda

from any Vanguard account she still had access to, or any account she had a right

to receive after his death.[52]   The recordings also demonstrate Richard's progressive

mental deterioration.[53]

Richard's 2010 request to remove Lucinda from the Vanguard TODs was

not properly processed, so he called Vanguard multiple times in both 2011 and

2012 attempting to finalize the removal.[54]   He was unsuccessful:  as explained via

order on summary judgment, Lucinda consistently remained the beneficiary on

Richard's Vanguard TODs.[55]   She likewise remained an owner of the Vanguard

---

[48] JX 11 at 5–8; JX 17 at 55–60; JX 18 at 74–75; JX 22 at 11–128; JX 23 at 138–140.

[49] JX 34 at Papa 20 (Lucinda: "and your father does not even have a computer…"); JX 22 at 112; JX 50 at 15; JX 51 at 38; JX 52 at 45; JX 53 at 50-51; R. M. DeGroat Tr. 397:5–13, 482:17–19; A. J. DeGroat 586:7–14; Iacovetti 729:19–730:1; J. DeGroat Tr. 778:18–20.

[50] JX 11 at 5–8; JX 17 at 55–60; JX 18 at 74–75; JX 22 at 114–128; JX 23 at 138–140.

[51] JX 11 at 5–8; JX 17 at 55–60; JX 18 at 74–75; JX 22 at 114–128; JX 23 at 138–140.

[52] JX 11 at 5–8; JX 17 at 55–60; JX 18 at 74–75; JX 22 at 114–128; JX 23 at 138–140.

[53] JX 13 at 36–44; JX 50 at 9–21; JX 51 at 27–28.

[54] JX 11 at 5–8; JX 17 at 55–60; JX 18 at 74–75; JX 22 at 114–128; JX 23 at 138–140.

[55] D.I. 196 ¶¶ 9, 14.

Joint Account. After realizing there was only $7.91 in the Vanguard Joint Account Richard lost interest closing it.[56] Richard could not unilaterally remove her in any event.[57] She also remained the beneficiary of Richard's Fidelity IRAs until those funds were closed and transferred to the Vanguard IRAs in November 2013.[58]

In 2011, continuing his attempt to divest Lucinda of his assets, Richard hired Gary Spritz, Esquire, to create an estate plan that excluded Lucinda.[59] Michael and Andrew had been encouraging Richard to create a will, because they "d[idn]'t want to get stuck dealing with the state or whoever they have to deal with every year."[60] Richard thought this was a "reasonable request on their part."[61] There is no evidence that Michael and Andrew pressured Richard to execute a will with any particular terms. Richard told Mr. Spritz that he trusted Michael.[62]

Represented by Mr. Spritz, Richard executed a Last Will and Testament on January 11, 2012 (the "Will").[63] The Will made a specific bequest of a piece of personal property to one of Richard's granddaughters, and left the rest of his estate

---

[56] JX 18 at 74–78; Papa Tr. 1101:7–13.

[57] JX 18 at 74–78.

[58] JX 12 at DeGroat 1472, Papa 1086; R. M. DeGroat Tr. 540:12–543:16; Papa Tr. 877:7–13, 878:6–22, 885:17–886:11, 899:14–22.

[59] Spritz Tr. 326:4–7, 339:7–24.

[60] JX 18 at 81.

[61] JX 18 at 81–82.

[62] Spritz Tr. 327:17–328:13.

[63] PTO ¶ 2 at 8; JX 19.

10

to his five children.[64] The Will named Michael as executor, and specifically instructed him to sell all real estate and sever any interests with Lucinda.[65] Richard also executed a power of attorney (the "2012 POA") and advance health care directive appointing Michael as his agent.[66] The 2012 POA did not give Michael the power to change Richard's beneficiaries.[67] Richard lost these documents and executed new versions in June 2012.[68] Mr. Spritz recommended that Richard file a petition for partition to sever his interest in the Property from Lucinda's interest, but Richard did not do so.[69]

Richard was competent and free from undue influence when he signed his Will.[70] Even so, in 2010, Richard began experiencing memory problems.[71] In August 2011, he told his podiatrist that he did not have any short-term memory and that he had woken up at a rest stop in another state in his pajamas.[72] In March

---

[64] JX 19; Spritz Tr. 335:3–9.

[65] JX 19; Spritz Tr. 335:11–18.

[66] JX 28; JX 29; Spritz Tr. 331:4–23.

[67] JX 28.

[68] PTO ¶ 2 at 9, 10; JX 28; JX 29; Spritz Tr. 331:4–23.

[69] JX 20 at DeGroat 3–4, 45; Spritz Tr. 341:2–14.

[70] JX 19; Spritz Tr. 327:14–328:4.

[71] JX 34 at Papa 17 (Lucinda acknowledging Richard is "an old, sick man"), at Papa 20 (Michael acknowledging Richard's "story telling and lack of memory is a problem"), at Papa 21 (Lucinda: "Also I will be charitable and say that your father's memory is bad, and it is true he does not remember everything correctly."); JX 13 at 36–44 (Richard: "my mind is going bad, too, but – I can't remember one day to the next"); JX 117 at 21.

[72] JX 15; Nippert Dep. Ex. B at 3092.

2012, Richard called Vanguard because he needed help depositing three checks.[73] He told Vanguard, "I have somewhat of a memory problem. I can't tell you what I had for breakfast yesterday morning . . . I live alone and I don't have any body to guide me through these normal day-to-day activities, because I can't remember one day to the next."[74] None of Richard's children were helping him. Richard still retained his executive functioning.[75]

### C.     Lucinda Reenters Richard's Life.

In early 2012, Lucinda began contacting Richard's family.[76] In 2012, Richard learned through one or both of his sons that Lucinda had remarried and that she and Ziatyk had bought a home earlier that same year.[77] Lucinda was displeased that Richard had found out about her new marriage and home.[78] On February 28, 2012, Richard called Lucinda's family's restaurant and asked for

---

[73] JX 24 at 152–156.

[74] *Id.* at 155–156.

[75] *Id.*

[76] JX 23 at 138–140, 146; JX 27; R. M. DeGroat Tr. 378:2–379:11, 380:15–23, 383:2–5.

[77] R. M. DeGroat Tr. 377:4–16, 380:24–381:23, 479:14–487:22; A. J. DeGroat Tr. 619:20–620:21. Lucinda had inadvertently emailed a photograph of her new house to Michael DeGroat, rather than Michael Ziatyk, and Michael confirmed the purchase through internet research. Among the DeGroat family, there was some initial confusion as to Michael Ziatyk's identity due to an architect with the same name living on Long Island, New York. Papa Tr. 844:13–23, 989:17–21.

[78] R. M. DeGroat Tr. 382:4–11.

Lucinda to call him.[79] Lucinda and Richard reconnected in the spring of 2012: Lucinda visited Richard several times in Delaware to assist him with cleaning and repairing the Property, and she emailed Michael repeatedly about Richard's affairs.[80] Michael had known Richard's affairs were somewhat in chaos, but had not helped his father.[81] Michael appreciated Lucinda's assistance to Richard related to the Property.[82]

Lucinda was very concerned about the Property's depreciation in value and became focused on repairing the house.[83] Lucinda framed the Property's issues as concerning "the money which was unquestionably [hers]," and portrayed Richard as irrational and delusional.[84] Lucinda was unable to improve the Property's condition, either on her own or with Michael or Richard. So by August 2012, Lucinda concluded she was "going to have to see an attorney to find out what should be done to salvage the situation."[85]

---

[79] JX 25 at Papa 3.

[80] JX 27; JX 30.

[81] JX 25 at Papa 3; JX 27 at Papa 3.

[82] JX 34 at Papa 12.

[83] JX 27.

[84] *Id.* at Papa 2.

[85] JX 30 at Papa 8. Lucinda complained to Michael that because the Property had not been sold, she "could not buy a decent house in which to move all my things." *Id.* But she and Ziatyk had purchased a home for $560,000 five months earlier.

13

Richard's affairs continued to deteriorate, and in November 2012 he wrote Lucinda a letter:

> I'm in need of a facilitator to assist in correcting several problems.  I sure could use your help as the problems are rapidly growing worse.
> xoxo* R
> If coming bring a phone + computer[86]

Lucinda increased her assistance to Richard.

In December 2012, Lucinda engaged Thomas Ferry, Esquire, to convert the Property's ownership from tenancy in common to joint tenancy with a right of survivorship.[87]  In his notes, Mr. Ferry stated their mission as:  "Will try to get ex to sign deed to JTWROS → either by son who may have POA or get doctor's note."[88]  Mr. Ferry raised the issue of Richard's competence, and Lucinda assured him Richard was competent.[89]  Richard initially rejected signing a new deed and sought advice from Mr. Spritz.[90]  Mr. Spritz recommended against Richard signing the deed.[91]

On December 12, Lucinda asked Michael to sign a letter confirming Richard's competency, leaving it "up to [Michael]" if he wanted to give Richard a

---

[86] JX 32.  Lucinda testified that "xoxo*" was Richard's preferred signature line during their marriage.  Papa Tr. 850:15–19.

[87] JX 33 at Papa 1629, 1635–1637.

[88] JX 35 at Papa 1639.

[89] JX 33 at Papa 1633.

[90] JX 33 at Papa 1631.

[91] Spritz Tr. 344:13–19.

copy; she explained that it was easier for Michael to sign it than to obtain a competency statement from Richard's doctor.[92] Michael did not substantively respond to Lucinda as quickly as she expected. On December 17, Michael told Lucinda that on first discussing the letter with Richard, Richard said it was "fine for [Michael] to sign it," but that Richard was confused as to Lucinda's intent and would continue to seek the advice of counsel.[93] Michael also raised the issue of Richard's competency.[94] Lucinda then discussed the issue with Richard directly.[95] In a letter dated December 17, Lucinda articulated how much money Richard had and offered Richard her share of the house for $200,000.[96]

Lucinda's next tactic was for Mr. Ferry to threaten Richard, individually, with a sale, which she suggested to Mr. Ferry on December 19.[97] But Mr. Ferry told Lucinda that he could not approach Richard directly because Richard was represented by Mr. Spritz.[98] Two days later, Lucinda told Mr. Ferry that Richard had fired Mr. Spritz.[99] At trial, Mr. Spritz testified this was untrue.[100] Richard

---

[92] JX 34 at Papa 19.

[93] JX 34 at Papa 17; R. M. DeGroat Tr. 516:3–12; 520:2–13.

[94] JX 34 at Papa 20.

[95] JX 34 at Papa 17.

[96] JX 36 at Papa 772 ("I saw that you have in excess of $400K in fidelity, and I estimate you have somewhere between $150-200K in Vanguard.").

[97] JX 33 at Papa 1632.

[98] JX 33 at Papa 1631.

[99] JX 33 at Papa 1623.

never contacted Mr. Spritz again after December, but Richard did not formally fire Mr. Spritz.[101]

On December 24, Lucinda wrote Richard and Michael, asking them both to attend a deed signing at Mr. Ferry's office.[102] That night, Michael and his siblings expected Richard to drive himself to Michael's house for Christmas Eve. Richard got lost and arrived in the middle of the night.[103] Richard explained simply that "he got lost driving to the house."[104] The drive from the Property to Michael's house is approximately one hour, but that night, it took Richard twelve to thirteen hours.[105]

Lucinda approached Richard directly again via letter dated January 5, 2013.[106] The letter references Richard's requests for help with his affairs, including the Property's HVAC. Lucinda wrote:

> I will come to help with the HVAC on Friday, the 11th, only if we also take care of the house issue the same time. We can either sign documents to correct the title or you can buy me out. . . . You seem to think nothing of asking me to inconvenience myself to help you with all sorts of problems, yet you will not correct an egregiously wrong situation for me. . . . Have you even told Michael, as your executor,

---

[100] Spritz Tr. 350:8–351:1.

[101] Spritz Tr. 350:8–351:1.

[102] JX 34 at Papa 24.

[103] R. M. DeGroat Tr. 385:3–389:8.

[104] R. M. DeGroat Tr. 385:24–386:6.

[105] R. M. DeGroat Tr. 386:10–21.

[106] JX 40.

that the house is mine and he should have it turned over to me if you die? Last I knew, he was planning to take half for your family.[107]

On January 10, Richard asked his primary care physician, Dr. Matthew O'Brien, for a note about his competence, as protection to make his own decisions; Dr. O'Brien did not know the note was specifically in support of executing a deed; Richard had told him "people were after his money."[108] Dr. O'Brien wrote, "Mr. DeGroat has mild memory impairment, not significant enough to affect incite [sic] or judgment."[109] Dr. O'Brien based the note on his experience as Richard's primary care physician, his experience treating geriatric patients, and Richard's interactions with Dr. O'Brien and performance on a mini-mental exam.[110] Dr. O'Brien testified that he believed his note would have supported Richard being competent to execute a will.[111] At this time, Michael, too, believed Richard was "handling his affairs just fine."[112]

On January 11, Lucinda notified Richard of a January 29 appointment to sign the deed, and pleasantly increased her efforts to assist Richard with his affairs.[113] On January 29, Richard and Lucinda executed a deed retitling their interests in the

---

[107] JX 40 at Papa 774.

[108] Tavani Tr. 36:8–37:13; O'Brien Dep. 74:9–16, 85:8–15.

[109] JX 16 at DeGroat 1197.

[110] O'Brien Dep. 20:22–21:13, 73:18–74:8, 75:3–24, 76:11–13.

[111] O'Brien Dep. 81:6–82:18.

[112] Tavani Tr. 179:14–24.

[113] JX 40 at Papa 212–214.

Property to a joint tenancy with right of survivorship.[114] Michael declined to attend the signing, but discussed the proposed deed with Richard and understood his father approved it.[115] Mr. Ferry oversaw the execution, and saw no signs of undue influence or a lack of competence.[116] Following the deed signing, Lucinda contends she and Richard had dinner and entered into the 2013 Verbal Agreement.[117] Richard signed an acknowledgement of the deed on March 4.[118] There is no documentation for the 2013 Verbal Agreement.

### D.    Lucinda Takes Over Richard's Financial Affairs, And Takes His Funds.

Having obtained the right of survivorship she sought, Lucinda cheerfully and warmly dove into managing Richard's affairs. She completed Richard's tax returns, paid his bills, drove him to his doctor's appointments, helped repair and maintain the Property, and provided Richard with companionship.[119] She frequently drove from Massachusetts to help Richard, as well as her ailing mother who was also in the area.[120] Richard's family was grateful to Lucinda for this

---

[114] PTO ¶ 2 at 11; JX 42.

[115] Papa 857:2–15; R. M. DeGroat 516:3–12, 520:2-13; JX 34 at Papa 24.

[116] Ferry Dep. 87:14–89:3.

[117] Papa Tr. 1026:5–1030:23.

[118] Ferry Dep. 89:11–90:14.

[119] JX 48 at VGI 4506, Papa 216; JX 41 at Papa 488; JX 54 at Papa 219.

[120] Papa Tr. 867:7–21, 907:1–4; JX 41 at Papa 215, 488; JX 54 at Papa 222.

assistance.[121]  She assured Richard, "I will make sure all money & bills are taken care of – do not worry about that."[122]  Richard confirmed to Vanguard that Lucinda was assisting:  "I'm pulling together information for a CPA."[123]  He also informed Vanguard that Lucinda was "appointed to help me with a lot of financial problems that I'm having trouble with . . . I have quite a lot of memory difficulty and my records get totally screwed up without this lady's help."[124]

But Lucinda also began helping herself to some of Richard's assets.  Richard had forgotten to take his 2012 required minimum distribution ("RMD") from his IRA.  In March 2013, Lucinda rectified that omission with Richard's permission— he referred to her as "my tax expert"—but she deposited at least some of the funds in her own account.[125]

At some point in the past, Richard had placed a block on Lucinda's email address at Vanguard.[126]  In June of 2013, Lucinda called Vanguard and obtained

---

[121] JX 71 at Papa 32, 33.

[122] JX 54 at Papa 219.

[123] JX 43 at 3.

[124] JX 47 at 274.

[125] JX 44 at 223–26, 238; JX 48 at VGI 4512.  Lucinda told Vanguard that Richard forgot to take his 2012 distribution because he was having memory problems and she had a doctor's note as proof.  JX 44 at 226, 238.

[126] JX 53.

online access to Richard's accounts at both Vanguard and Fidelity.[127] Richard did not understand the purpose of these calls.[128]

After obtaining online access, Lucinda reviewed the beneficiary page for the Fidelity account.[129] In July, Lucinda completed paperwork with Richard's notarized signature to become the power of attorney on Richard's Vanguard TODs, IRAs, and Joint Account.[130] As Lucinda admitted, she updated the mailing address to the Property for the Vanguard Joint Account online on July 15.[131]

Lucinda got to work. She made herself the primary beneficiary of the Vanguard IRAs on July 12, 2013.[132] On July 26, Lucinda seeded the Vanguard Joint Account with $55,000 from Richard's solely owned Vanguard account.[133] In August, she wrote herself a $50,000 check from the Vanguard Joint Account with

---

[127] JX 53; JX 52.

[128] JX 53 at 50 (Richard: "I'm not sure exactly what she's trying to do."); JX 52 at 45 (Richard: "I'm not really sure the reason of my call. I'll put the lady back on the phone, maybe she can explain it to me because. . .").

[129] JX 55.

[130] Papa Tr. 893:3–894:9; JX 130 at Papa 789–95.

[131] JX 56 at VGI 1311; Papa Tr. 1040:17–21. The mailing address for Richard's Vanguard TODs and IRAs was also changed to the Property on July 9. JX 56 at VGI VGI 1305, 1307. Lucinda makes much of the fact that statements showing Lucinda was the primary beneficiary of Richard's Vanguard accounts went to his home, where he could have seen them, and yet Richard did not raise any alarm. D.I. 259 at 16 (citing JX 1 at VGI 1365, 1366, 1367; JX 56 at VGI 1375; JX 62 at VGI 1315; JX 67 at VGI 1317, 1379). Richard's affairs were chaotic, and he needed assistance to organize them. I do not infer that Richard received notice of Lucinda's actions from the fact that statements were mailed to his home.

[132] JX 56 at VGI 1375–1376; R. M. DeGroat 544:12–18.

[133] JX 56 at VGI 686.

the memo line "Partial House Adj. Settlement Transfer."[134]  And in September, she gave herself another $5,000 from the Vanguard Joint Account for "rent."[135]

In April 2013, Lucinda started suggesting Richard move his Fidelity IRAs to Vanguard for better returns.[136]  In November, after Lucinda made herself the Vanguard IRAs' beneficiary, she closed Richard's Fidelity IRAs and transferred approximately $439,000 into the Vanguard IRAs.[137]  During this time, Lucinda reassured Richard that she was handling his bills.[138]

At trial, Lucinda testified for the first time that Richard made all of the changes to his Vanguard accounts himself, using a computer.[139]  But Richard did

---

[134] JX 58 at VGI 4838.

[135] JX 60 at VGI 4839.

[136] Papa Tr. 899:14–22.  At trial, Lucinda claimed that she only learned that Richard had named Jan and Carroll as beneficiaries to his Vanguard IRAs after he died, as a result of this litigation.  Papa Tr. 887:4–891:1; JX 116 at 68–72.  But Lucinda made herself beneficiary of the Vanguard IRAs in July 2013, thereby learning – if she did not know already – that she had not previously been the beneficiary.  And in January 2014, she ensured she was the beneficiary.  *See infra*, n. 171.  Lucinda's testimony on this point is not credible.

She also argues that her April 2013 suggestion that Richard move his Fidelity assets to his Vanguard IRAs is evidence she did not know she had been removed as the Vanguard IRA beneficiary, because if she had known that fact she would not have advocated moving money from the Fidelity IRAs (for which she was the beneficiary) to the Vanguard IRAs (for which she was not).  This argument is betrayed by the facts: Lucinda transferred the Fidelity IRAs to Vanguard after making herself the Vanguard IRAs' beneficiary.

[137] Papa Tr. 877:7–13, 878:6-22, 885:17–886:11.

[138] JX 59 at Papa 229.

[139] Papa Tr. 884:8–885:10.

21

not know how to use a computer or how to electronically access his accounts.[140] Richard was not technologically savvy, and several witnesses testified that he did not own a computer.[141] Between them, only Lucinda knew how to operate a computer.[142] Lucinda has admitted to making a few online transactions, namely updating the mailing address for the Vanguard Joint Account and making Michael the secondary beneficiary on the Vanguard TODs and IRAs.[143] I find Lucinda, not Richard, completed all of the online actions; none of Lucinda's testimony proves otherwise.[144]

During 2013, Richard's memory continued to deteriorate. On his calls with Vanguard, Richard was able to keep up social banter, but he also told rambling,

---

[140] JX 34 at Papa 20 (Lucinda: "and your father does not even have a computer…"); JX 22 at 112; JX 50 at 15; JX 51 at 38; JX 52 at 45; JX 53 at 50-51; R. M. DeGroat Tr. 397:5–13, 482:17–19; A. J. DeGroat 586:7–14; Iacovetti 729:19–730:1; J. DeGroat Tr. 778:18–20.

[141] JX 34 at Papa 20 (Lucinda: "and your father does not even have a computer…"); JX 22 at 112; JX 50 at 15; JX 51 at 38; JX 52 at 45; JX 53 at 50-51; R. M. DeGroat Tr. 397:5–13, 482:17–19; A. J. DeGroat 586:7–14; Iacovetti 729:19–730:1; J. DeGroat Tr. 778:18–20.

[142] JX 34 at Papa 20 (Lucinda: "and your father does not even have a computer…"); JX 22 at 112; JX 50 at 15; JX 51 at 38; JX 52 at 45; JX 53 at 50-51; R. M. DeGroat Tr. 397:5–13, 482:17–19; A. J. DeGroat 586:7–14; Iacovetti 729:19–730:1; J. DeGroat Tr. 778:18–20; Papa Tr. 884:15–17, 956:5–10.

[143] JX 56 at VGI 1311; Papa Tr. 1040:17–21; JX 85 at VGI 1381–1382; JX 86 at Papa 494.

[144] Papa Tr. 884:8–885:10, 1004:3–1007:1. Lucinda points to a call she made to Vanguard in 2016 in which she mentioned her own ignorance on Richard having made changes. JX 116 at 68–69. In view of substantial evidence to the contrary, I conclude this call was feigned in view of this dispute and give it no weight. Richard never knew how to operate a computer.

bizarre stories, and was unable to accomplish the reasons for his call.[145] He authorized Lucinda to help him with his Vanguard affairs.[146] Richard told Vanguard he did not want to use a computer.[147] Richard still retained some executive function: his medical records from this time do not reflect any lack of competence, and he was able to meet with service providers and express his preferences.[148]

In early 2013, Lucinda reignited discussions with Richard regarding Maris Grove, the independent apartment complex where Richard had left a deposit in 2005.[149] After Richard left his deposit, Maris Grove entered bankruptcy and emerged with new owners.[150] Richard was not certain he still wanted to live there under the new ownership.[151] Throughout 2013, Lucinda and Richard discussed senior living facilities with friends.[152]

---

[145] JX 43 at 4–5; JX 47 at 273–74;  JX 50 at 9–21.

[146] JX 44 at 228–229; JX 47 at 274.

[147] JX 51 at 38.

[148] O'Brien Dep. 30:7–16, 74:22–76:5; Nippert Dep. Ex. B at 3092; Eastburn Tr. 1199:7–20, 1208:14–23.

[149] Papa Tr. 828:6–20, 868:20–869:15.

[150] Papa Tr. 868:20–869:15.

[151] Papa Tr. 868:20–869:15.

[152] Papa Tr. 868:20–869:15.

On July 8, Lucinda contacted Forwood Manor to ask about an independent living apartment for Richard.[153]  Lucinda informed Forwood Manor that she was "taking care of [her] ex-husband who is 80 years old."[154]  Through July, Lucinda discussed the possibility of Richard's move with Rose Murowany at Forwood; Lucinda told Murowany that she was "having a tough time convincing [Richard] to visit FM."[155]  On August 21, Richard and Lucinda toured Forwood Manor.[156]  They came back on September 17, and Richard focused on the garages and food.[157]  Murowany testified that she did not witness any disorientation, frustration, hesitation, or confusion in Richard while he was finalizing his decision to move to Forwood.[158]

On November 13, Lucinda purchased and downloaded a power of attorney form.[159]  The power of attorney did not permit Lucinda to make gifts to herself or to take any action in satisfaction of a legal obligation of Richard's agent.[160]  On December 2, she drove Richard to Artisans' Bank, where Richard signed the power

---

[153] JX 57 at Papa 951.

[154] JX 57 at Papa 949.

[155] JX 57 at Papa 951.

[156] JX 57 at Papa 951; Murowany Tr. 1226:2–5.

[157] JX 57 at Papa 951.

[158] Murowany Tr. 1226:13–19.

[159] JX 66.

[160] JX 68.

of attorney form (the "2013 POA").[161] Richard and a witness signed it in the presence of a notary who documented, and later testified, that Richard did so as a free and voluntary act.[162] Michael, too, believed Richard was capable of signing the 2013 POA of his own free will.[163] That same day, as Richard's power of attorney, Lucinda filled out registration forms for Forwood Manor.[164] Three days later, Lucinda wrote herself a check for $30,000 out of Richard's Vanguard TODs with the memo line "Happy 60th + House."[165]

On Christmas Eve 2013, Richard once again attempted to drive to Michael's house in New Jersey for the family celebration. He never made it: he accidentally drove south into Virginia. Richard's family was unable to locate him until December 26.[166] Richard signed up for Forwood Manor that same day, and moved in on December 27.[167] Michael had no concerns about this move and believed

---

[161] PTO ¶ 2 at 12; JX 68 at Papa 246; Beers Dep. 14:3–15:18, 37:17–30:3.

[162] PTO ¶ 2 at 12; JX 68 at Papa 246; Beers Dep. 29:9–31:5, 42:4–11, 53:8–57:23.

[163] Michael first became aware of the 2013 POA a few months later at a family function. At that time, Michael did not express concerns that the execution of the 2013 POA was a result of Lucinda's undue influence. Michael was instead relieved he no longer had the stress of being his father's power of attorney. R. M. DeGroat Tr. 525:1–527:22. Michael testified that when he became aware of the 2013 POA he was surprised, but he "wasn't going to question my father because we were happy that he was in a safe place." R. M. DeGroat Tr. 417:23–418:4. Michael also testified that he is not seeking to have the 2013 POA invalidated. R. M. DeGroat Tr. 575:20–576:2.

[164] JX 57 at Papa 1003.

[165] JX 69 at VGI 4526.

[166] R. M. DeGroat Tr. 388:1–389:8.

[167] JX 57 at Papa 958–84; R. M. DeGroat Tr. 414:5–8.

moving to Forwood was Richard's decision.[168]   Once again, Richard's family was grateful to Lucinda for her assistance to Richard.[169]

But Lucinda continued to divert Richard's assets for her own benefit.   The week after Richard moved to Forwood, Lucinda used Richard's credit card multiple times in New Jersey and Massachusetts.[170]   The following week, on two separate occasions, Lucinda ensured she was the beneficiary of the Vanguard IRAs and that the transfer of the Fidelity IRAs was properly processed.[171]   On January 10, 2014, Lucinda transferred funds from Richard's IRAs to the Vanguard Joint Account.[172]   On January 21, Lucinda transferred $41,000 to herself from the Vanguard Joint Account.[173]   She transferred another $7,300 from that account to herself in April,[174] and transferred another $19,500 to herself from that account in May.[175]   In August, she made Michael the secondary beneficiary for the Vanguard

---

[168] R. M. DeGroat Tr. 529:25–30:21.

[169] JX 71 at Papa 32–33.

[170] JX 118 at DeGroat 1579–1581; Papa Tr. 917:19–918:3.

[171] JX 75; JX 76.

[172] D.I. 272 at VGI 4876.  This was the first of many similar transactions during this time frame.  *See also* D.I. 272 at 4878, 4880, 4882, 4886, 4890.

[173] JX 74 at VGI 4840.

[174] JX 78 at VGI 4846.

[175] JX 82 at VGI 4844, 4847.

IRAs and TODs, and informed him she had made this decision and that she was the primary beneficiary.[176]

In January 2014, after Richard moved out of the Property, Lucinda and Ziatyk moved in to renovate it. Repairs totaling $65,000 were paid for out of the Vanguard Joint Account, seeded by Richard's solely owned funds.[177] While Lucinda claims to have paid $118,000 in cash to moonlighting laborers, this testimony is not credible and is not supported by any contemporaneous records; I do not believe Lucinda paid for any renovations with her funds or funds that she borrowed.[178]

---

[176] JX 85 at VGI 1381–1382; JX 86 at Papa 494.

[177] R. M. DeGroat Tr. 424:23–425:2; Kane Tr. 654:1–7; D.I. 273; JX 119.

[178] At her deposition and at trial, Lucinda contended she paid an additional approximately $118,000 in cash to renovate the Property's foundation, paid to subcontractors moonlighting aside from their work for Lucinda's contractor, TC Builders. Papa Tr. 1109:5–1120:7; R. M. DeGroat Tr. 425:21–427:2. Lucinda claims to have borrowed the cash from the safe at her family's restaurant, which is why she later paid the restaurant with the proceeds from selling the Property. Papa Tr. 915:17–20, 922:12–23; JX 91. But no evidence corroborates her testimony, and the only person she states witnessed the withdrawals from the restaurant's safe is Richard. Papa Tr. 916:4–8, 1115:20–22, 1118:16–18. Lucinda claims her brother Tim Papa approved the loan, but he did not testify to confirm this allegation. Papa Tr. 1123:5–1124:18 ("Q: Why isn't Tim Papa here? He's your brother. Why haven't you called him to explain these things? Papa A: I don't know the answer to that question"). I conclude Lucinda did not borrow cash from the restaurant to pay for renovations on the Property.

I also conclude Lucinda did not pay cash to any moonlighting laborers. Lucinda identified the principal subcontractor only by the name "Carlos," testifying that he was of Hispanic descent and that she repeatedly felt unsafe when meeting Carlos alone to pay him with bags of cash. Papa Tr. 1109:5–18, 1112:11–13, 1118:7–10. At trial, the owner of TC Builders, Tom Cekine, confirmed that no subcontractor or employee named Carlos existed, that no foundation repairs were completed, and that TC Builders was never paid

Lucinda prepared the Property for sale, telling the realtor that she was working with Michael and communicating with him throughout the price negotiations, when, in fact, she was not.[179] On disclosures, Lucinda noted that the Property was "to be sold as divorce settlement."[180] The Property was sold in October 2014 under Lucinda's authority as Richard's power of attorney.[181] Even though she jointly owned the Property with Richard, Lucinda wired all $402,000 in proceeds to herself; Richard received nothing.[182] Michael did not learn Lucinda sold the house until months later.[183]

---

in cash. Cekine Tr. 704:17–707:2. Additionally, Ziatyk, who was specifically tasked with protecting Lucinda from dishonest contractors, admitted that he had zero knowledge of Carlos and the alleged cash payments. Ziatyk Tr. 1270:3–1271:7.

At trial, Lucinda modified her deposition story and identified a new contractor, a plumber from Pennsylvania, who also demanded to be paid in cash. Papa Tr. 1109:5–1110:23. She also stated that she paid some of the money not to Carlos, but to "crews" of diggers. Papa Tr. 1111:4–22. Lucinda testified that a written ledger existed to prove that she paid $118,000 in cash to these contractors, but that it has been lost. Papa Tr. 1118:11–1119:12. She was also confident that at one time she had "all the receipts" for the repairs, but apparently Richard had lost them. Papa Tr. 947:15–20. Contradictorily, she also claims to have given all of the receipts to the new homeowners. Papa Tr. 949:2–951:8. Lucinda has not asked those homeowners for the receipts during this litigation and did not believe that to be necessary. Papa Tr. 949:2–951:8. Lucinda's testimony about cash payments is not credible.

[179] JX 83 at DeGroat 3369, 3372.

[180] JX 79 at DeGroat 3176.

[181] PTO ¶ 2 at 13; JX 90 at DeGroat 532; JX 68.

[182] JX 90 at DeGroat 532, 3678, 3872.

[183] R. M. DeGroat Tr. 427:3–23.

Lucinda continued to assist Richard while he lived in in Forwood Manor.[184] Richard's mental condition continued to deteriorate, although he retained good insight and judgment, and the ability to converse on a variety of topics.[185] Lucinda also continued to transfer Richard's assets to herself. In December 2014, Lucinda completed paperwork to make herself the primary beneficiary of Richard's Penn Mutual and Lincoln Financial policies.[186] In April 2015, Lucinda submitted surrender requests for Richard's Lincoln Financial policies and liquidated the funds.[187] In July 2015, Lucinda took the maximum loan against Richard's Penn Mutual policies, kept the proceeds of $44,182.18, and used the funds to pay her and Ziatyk's mortgage.[188]

That same month, Richard signed forms authorizing Lucinda to be a signatory on his Artisans' Bank checking account.[189] The clerk who witnessed that signing did not see anything amiss.[190]

---

[184] *See, e.g.*, Papa Tr. 916:4–22, 924:9-20.

[185] JX 16 at Degroat 1119, 1201; O'Brien Dep. 36:8–10, 36:20–37:22, 38:22–41:8, 41:20-22, 77:18-22; Eastburn Tr. 1196:17–1200:24.

[186] JX 94; JX 95; JX 100.

[187] JX 100.

[188] JX 103; JX 104; Papa Tr. 1064:18–1066:18.

[189] JX 126; Sedlicek Tr. 1180:5–1184:18.

[190] JX 126; Sedlicek Tr. 1180:5–1184:18.

## E.    Richard Dies, And Litigation Ensues.

In September 2015, Richard fell in his Forwood Manor apartment and was severely injured.[191] He was hospitalized, and hospital records reflect that both Richard's doctors and Lucinda believed he had dementia.[192] These events led Carroll to conclude for the first time that Richard was incapacitated.[193] Lucinda continued to assist with Richard's care through his transition from the hospital, to ManorCare, and to Sunrise of Dresher, until his death on June 14, 2016.[194] Again, Richard's family was grateful.[195]

But Lucinda continued to take Richard's assets for herself. While he was in the hospital, she transferred $48,025 to herself from the Vanguard Joint Account, with misleading and false check memo lines.[196] The night before Richard died, Michael and Andrew began to ask Lucinda about Richard's finances and reached out to gather information about their father's estate.[197] Lucinda told Michael that

---

[191] PTO ¶ 2 at 14; JX 106 at DeGroat 1290; Eastburn Tr. 1201:7–1202:14.

[192] JX 106 at DeGroat 1298–1299, 1301.

[193] Iacovetti Tr. 754:16–24. Previously, she had concerns regarding his driving, but was unaware of his incapacitation. *Id.*

[194] Papa Tr. 926:4–928:4, 929:13–930:5; R. M. DeGroat 564: 8–11, 587:3–10; Iacovetti 755:4–8; PTO ¶ 2 at 15. Richard was transferred from Manor Care in Delaware to Sunrise of Dresher in Pennsylvania to be closer to Michael because Michael was the primary agent for his father's advanced healthcare directive. Papa Tr. 926:4–14; PTO ¶ 2 at 10; JX 29.

[195] JX 105 at Papa 81; JX 111 at Papa 172, 174.

[196] JX 108; JX 109; Papa Tr. 1067:7–1077:18.

[197] R. M. DeGroat Tr. 565:2–566:15; JX 111 at Papa 176.

she would handle everything because "Pop made [her] his POA surviving death"[198] and that she was the beneficiary of all of his accounts.[198] Richard passed away on June 14, 2016.[199]

Michael and Lucinda retained attorneys.[200] In August 2016, Lucinda's counsel gave Michael's counsel a summary of Richard's assets with "detailed background information" that Lucinda prepared.[201] At this time, Richard's remaining assets included Richard's Vanguard accounts, a bank account at Artisans' Bank containing a couple hundred dollars, and two life insurance policies through Penn Mutual worth approximately $10,000.[202] Richard's estate comprised the remaining funds from the Penn Mutual policies, which Lucinda had previously drained by taking a maximum loan against the policies for $44,000, and the minimal assets in the Artisans' Bank account.[203]

Richard's Vanguard accounts, which passed by beneficiary designation, were without question the most significant remaining asset. On September 6, Vanguard notified Lucinda that it was placing a freeze on Richard's accounts due

---

[198] JX 111 at Papa 178.

[199] PTO ¶ 2 at 15.

[200] R. M. DeGroat Tr. 566:24–570:10; Papa Tr. 1094:2–4.

[201] JX 113; Papa Tr. 1094:2–4.

[202] JX 113.

[203] JX 103; JX 104; JX 113; R. M. DeGroat Tr. 441:24–442:19; Papa Tr. 1064:18–1066:18.

to competing claims over the accounts' proper beneficiaries.[204]   The freeze was lifted the following month, after Vanguard did not receive adequate documentation of the dispute.[205]   The next day, Lucinda sold all of her Vanguard assets, including her individual assets and the assets she received as a beneficiary to Richard's accounts.[206]

On September 9, Michael filed a Verified Complaint to Invalidate Transfer of Property and/or Re-Titling of Assets, for Accounting, and for Constructive Trust (the "Complaint").[207]   The Complaint asserts five counts seeking: (i) an invalidation of transfers of property and/or retitling of assets by Lucinda from 2013 through 2016, (ii) an accounting of Lucinda's actions under the Durable Personal Powers of Attorney Act (the "POA Act"), (iii) the imposition of a constructive trust, (iv) a declaration of unjust enrichment, and (v) a declaration of undue influence.[208]   On November 11, Lucinda filed an Answer and Counterclaim.[209] The Counterclaim asserts breach of the alleged divorce agreement; promissory estoppel in the alternative of a breach of contract; tortious interference of the

---

[204] JX 130 at Papa 233–234.

[205] JX 125.

[206] Lucinda incurred a $47,438.70 loss on this transaction.  Papa Tr. 934:11–17, 1140:12–1141:6.

[207] D.I. 1.

[208] D.I. 1.

[209] D.I. 8.

alleged divorce agreement; damages resulting from Plaintiffs' alleged freezing of all of Richard's Vanguard accounts, excluding the Vanguard Joint Account; and an award of fees for bad faith litigation.

On August 16, 2018, a Complaint in Intervention was filed, adding Jan and Carroll as plaintiffs (together with Michael, "Plaintiffs"), and Ziatyk as a defendant (together with Lucinda, "Defendants") to the constructive trust and unjust enrichment claim.[210]

Defendants moved for summary judgment on September 25, 2018, and the Court heard argument on that motion on January 8, 2019.[211] On February 19, the Court issued an order granting the motion as to the Vanguard TODs and denying summary judgment on all other grounds.[212]

I held a four-day trial in this matter on June 18, July 1, July 2, and July 3, 2019.[213] The parties presented over 130 joint exhibits and presented fifteen witnesses including Michael, Carroll, Andrew, Jan, Lucinda, and Ziatyk, as well as Cekine, Murowany, and Mr. Spritz. Each side presented an expert witness on the issue of Richard's competence and susceptibility. Michael and his relatives presented Dr. Carol Tavani, who opined that Richard suffered from moderate to

---

[210] D.I. 170.

[211] D.I. 177, 195, 196, 238.

[212] D.I. 196.

[213] D.I. 245, 249, 250, 251, 252.

severe dementia and lacked testamentary capacity since 2013,[214] while Lucinda presented Dr. Sam Romirowsky, who opined that Richard was not a susceptible testator and did not have a weakened intellect between 2012 and 2015.[215]

On January 14, 2020, I heard post-trial argument and took the decision under advisement.[216] This is my post-trial memorandum opinion.

## II. ANALYSIS

Richard was alone and dependent on Lucinda from 2013 through his death, but he knowingly and willingly accepted her help. Richard's relatives consistently testified he would not have done something he did not want to do. Problems arose when Lucinda, as Richard's common law fiduciary, and later his fiduciary under the POA Act, took his assets for herself. As Richard's fiduciary, Lucinda bears the burden to establish that all self-interested transactions she completed on Richard's behalf are fair. Lucinda has failed to carry this burden.

Richard did not intend for Lucinda to have the assets she took from him. Lucinda took Richard's share of the Property, at least part of his 2012 RMD, liquid funds transferred through the Joint Account and Richard's credit card, and funds out of his life insurance policies. After his passing, Lucinda retained Richard's retirement accounts. Lucinda argues, but has failed to prove, that she and Richard

---

[214] JX 117; Tavani Tr. 140:19–24.

[215] JX 120; Romirowsky Tr. 264:10–265:9.

[216] D.I. 274, 275.

34

had verbally agreed that she was to receive these assets. The only agreement supported by credible evidence is their agreement to divorce, at which time Richard paid Lucinda $742,000 and each removed the other as beneficiary.

Lucinda and Ziatyk have been unjustly enriched by Lucinda's self-interested transactions conducted as Richard's fiduciary. Lucinda and Ziatyk's enrichment was not justified. As a result of the breaches of fiduciary duty and unjust enrichment, Plaintiffs are entitled to (i) an invalidation of all of Lucinda's transfers of Richard's assets and the re-titling of his accounts from 2013 until Richard's death, excluding the Vanguard TODs and Fidelity IRAs; (ii) a declaration that Lucinda's past accounting was incomplete; and (iii) a new accounting to properly assess damages.

### A. Lucinda Breached Her Fiduciary Duties Under Common Law And the POA Act.

Lucinda became Richard's common law fiduciary in January 2013. She also retained fiduciary duties under the POA Act after execution of the 2013 POA on December 2, 2013. Lucinda breached her common law fiduciary duties and her fiduciary duties under the POA Act. Although the new deed and 2013 POA were valid, Lucinda's actions with Richard's assets including retaining the proceeds from the sale of the Property, executing beneficiary changes to his Vanguard accounts, liquidating his life insurance policies, and charging his credit card were self-interested. These actions were completed without Richard's knowledge or

35

consent and were not fair to Richard. Lucinda has clearly breached her fiduciary duties to Richard under both common law and statue.

> ### 1. Lucinda Became Richard's Common Law Fiduciary In January 2013; Richard Then Signed The Valid 2013 POA.

The parties dispute whether Lucinda became Richard's common law fiduciary before Richard signed the 2013 POA.[217] Fiduciary relationships do not require the execution of a power of attorney or another formal document. Based on the preponderance of the evidence, I conclude that, as of January 2013, Lucinda assumed the role of Richard's fiduciary under common law fiduciary principles, and later formalized her role as fiduciary by the 2013 POA, which was a valid legal instrument governed by the POA Act.

---

[217] As an initial matter, Lucinda contests whether Plaintiffs pled a breach of common law fiduciary duty, or only a violation of the POA Act. Before trial, this Court decided several times that Plaintiffs pled a common law claim. *See*, *e.g.*, D.I. 91 at 15–19 (Master's Final Report recommending (i) the Court grant a motion to compel discovery into Lucinda's actions in late 2012 and early 2013 regarding the new deed, specifically, her communications with Thomas Ferry, Esq., and (ii) the Court deny Lucinda's motion to dismiss claims regarding those actions until all parties have the opportunity to present discovery); D.I. 144 at 28–29, 34–36 (*In the Matter of the Estate of Richard L. DeGroat*, a deceased person, C.A. No. 12738-VCZ (Del. Ch. Nov. 28, 2017) (TRANSCRIPT)); D.I. 174 at 89 (*In the Matter of the Estate of Richard L. DeGroat*, a deceased person, C.A. No. 12738-VCZ (Del. Ch. Aug. 10, 2018) (TRANSCRIPT)); D.I. 276 at 21-22 (*In the Matter of the Estate of Richard L. DeGroat*, a deceased person, C.A. No. 12738-VCZ (Del. Ch. June 10, 2019) (granting in part a motion in limine to permit the expert testimony of William Kane and his report including transactions that predate the execution of the 2013 POA)). This issue need not be readjudicated through the lens of Court of Chancery Rule 15(b).

"Even outside a formally recognized fiduciary relationship, a relationship predicated on particular confidence or reliance may give rise to fiduciary obligations. Eschewing a formalistic approach, Delaware courts have declined to establish set bounds for such relationships, in favor of a pragmatic, fact-driven inquiry."[218] In *Sloan v. Segal*, our Supreme Court stated,

> "[a] confidential relationship exists where 'circumstances make it certain the parties do not deal on equal terms but on one side there is an overmastering influence or on the other weakness, dependence or trust, justifiably reposed.'" This court has often found that a confidential relationship existed where, as here, an adult child was taking care of an aging or infirm parent. In those cases, the court took into consideration whether the testators' relationships with their non-caretaker children were strained and whether the caretaking children were acting with power of attorney for their parents. These circumstances lend themselves to the creation of a confidential relationship because the parent must rely on a trusted child for physical, emotional, or decisional support.[219]

"Generally, a fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect

---

[218] *Mitchell v. Reynolds*, 2009 WL 132881, at *9 (Del. Ch. Jan. 6, 2009).

[219] *See Sloan v. Segal* (*Sloan I*), 2009 WL 1204494, at *13 (Del. Ch. Apr. 24, 2009), (footnotes omitted) (quoting *In re Will of Wiltbank,* 2005 WL 2810725, at *6 (Del. Ch. Oct. 18, 2005)), *aff'd*, 996 A.2d 794 (Del. 2010) (TABLE); *see also Mitchell,* 2009 WL 132881, at *9 ("This Court has frequently looked to the transferor's extensive or exclusive reliance on another for physical, emotional, or decisional support, a query informed by the transferor's disposition and mental and physical capabilities, as well as the existence of any additional support network.").

the interests of another."[220]  In particular, being permitted access to a principal's bank account imposes fiduciary duties on an individual.[221]

Richard asked Lucinda to help as a facilitator for his financial affairs in November 2012.[222]  In January 2013, Lucinda offered to assist Richard with his affairs, conditioned on Richard's agreement to sign a deed granting Lucinda a right of survivorship in the Property.[223]  Richard accepted and signed the deed, and Lucinda confirmed that she would "make sure all money & bills are taken care of – do not worry about that."[224]  That month, long before execution of the 2013 POA, Lucinda obtained access to Richard's bank accounts for tax purposes.[225]  Lucinda testified that Richard gave her "full agency over [all] the Vanguard accounts to

---

[220] *Mitchell,* 2009 WL 132881, at *9 (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 113 (Del. 2006)).

[221] *See In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12 (Del. Ch. July 22, 2016) ("Patricia acted as a fiduciary to her parents when they allowed her to access the joint bank account and the line of credit to make expenditures on their behalf."); *see also Seiden v. Kaneko*, 2015 WL 7289338, at *11 (Del. Ch. Nov. 3, 2015) (finding a director remained a fiduciary of the company after resigning due to his continued access to and use of bank accounts); *In re Estate of Dean*, 2014 WL 4628584, at *2 (Del. Ch. Sept. 17, 2014) (holding that a person designated as signatory on bank accounts for the account-holder's convenience acted as a common-law fiduciary).

[222] JX 32.

[223] JX 40 at Papa 774.

[224] JX 54 at Papa 219.

[225] JX 41 at Papa 488; JX 44 at 246–247; JX 52; JX 53; JX 55 at Papa 1504.

manage them and execute everything for investment purposes. And [she] could do anything [she] wanted with that account [*i.e.* the Vanguard IRAs]."[226]

Lucinda likened her relationship with Richard in 2013 to that of "an old married couple."[227] By February, Lucinda had substantial knowledge of Richard's bank accounts, including his tax forms, account numbers, and the physical location of his records.[228] By March, Lucinda was actively transacting on Richard's Vanguard accounts and handling his financial affairs.[229] In April, Richard informed Vanguard that Lucinda was "appointed to help me with a lot of financial problems that I'm having trouble with . . . I have quite a lot of memory difficulty and my records get totally screwed up without this lady's help," and authorized Lucinda to complete his RMD for him.[230] Richard referred to her as "my tax expert."[231] By June 2013, Lucinda was fully handling Richard's financial affairs.

Lucinda formalized her role as Richard's fiduciary in the summer and final months of 2013. In July, Lucinda obtained power of attorney on the Vanguard TODs, IRAs, and Joint Account via a form that required Richard's notarized

---

[226] Papa Tr. 893:18–24.

[227] Papa Tr. 897:14–18.

[228] JX 41 at Papa 488.

[229] JX 44 at 246–247.

[230] JX 47 at 274; Romirowsky Tr. 276:17–277:4 (noting Richard references Lucinda Papa as "his tax expert, his assistant, the person he relies on to make financial transactions.").

[231] JX 44 at 223–226.

signature.[232]  She changed the mailing address for all of the Vanguard accounts to the Property, and made herself the primary beneficiary on the Vanguard IRAs.[233]  On November 13, Lucinda purchased and downloaded a more comprehensive power of attorney form.[234]  On December 2, she drove Richard to Artisans' Bank, where Richard signed the 2013 POA.[235]

The POA is a valid legal instrument under the POA Act.[236]  The preponderance of the evidence, and in particular Michael's testimony, establishes that Richard executed this document of his own free will.  Delaware law presumes testamentary capacity, and "the party attacking testamentary capacity bears the burden of proof."[237]  The standard is low:  an individual must "be capable of exercising thought, reflection and judgment, and must know what he or she is doing and how he or she is disposing of his or her property.[238]  "The person must also possess sufficient

---

[232] Papa Tr. 893:3–894:3; JX 130 at Papa 789–795.  Defendants do not challenge this power of attorney, and present no grounds on which to invalidate it.

[233] JX 56 at VGI 1305, 1311, 1375.

[234] JX 66.

[235] PTO ¶ 2 at 12; JX 68; Beers Dep. 14:3-13.

[236] See 12 Del. C. §§ 49A-119, 49A-120; PTO ¶ 2 at 12; JX 68.

[237] In re West, 522 A.2d 1256, 1263 (Del. 1987); see Matter of Kittila, 2015 WL 688868, at *11 (Del. Ch. Feb. 18, 2015) (measuring testamentary capacity at the time a document is executed); In Matter of Rick, 1994 WL 148268, at *5 (Del. Ch. Mar. 23, 1994), aff'd sub nom. 659 A.2d 228 (Del. 1995) (evaluating the validity of a power of attorney under the testamentary capacity standard).

[238] In re West, 522 A.2d at 1263; In re Purported Last Will and Testament of Wiltbank, 2005 WL 2810725, at *7 (Del. Ch. Oct. 18, 2005) ("Only a modest level of competence is required, however, for an individual to possess the testamentary capacity to execute a

memory and understanding to comprehend the nature and character of the act. Thus, the law requires [the testator] to have known that [he or] she was disposing of [his or] her estate by will, and to whom."[239]

The evidence shows that while Richard had memory problems, could not handle his more complex financial and residential affairs, and was losing the ability to drive, he retained testamentary capacity.

Michael testified that he became aware of the 2013 POA a few months after it was executed, that he did not have concerns about the document, and that he was not seeking to invalidate it.[240] Michael became aware of the 2013 POA after both Christmas incidents, but still did not express concerns that Richard unwillingly executed the POA.[241] Rather, Michael was relieved he would no longer have the responsibility of being his father's power of attorney.[242]

Michael's contemporaneous beliefs are consistent with the rest of the evidence surrounding Richard's execution of the 2013 POA. Richard signed the

---

will. Courts have long held there is a low standard for testamentary capacity." (internal citations omitted)); *Matter of Purported Last Will and Testament of Macklin*, 1991 WL 9981, at *2 (Del. Ch. Jan. 23, 1991) (finding that age-related deterioration reflected in driving deficiencies, memory problems, a "shambles" of a home, and shortcomings in personal grooming does not "establish[] that degree of deterioration that deprives one of testamentary capacity").

[239] *In re West*, 522 A.2d at 1263.

[240] R. M. DeGroat Tr. 417:22–418:4, 525:1–527:22, 575:20–576:2.

[241] R. M. DeGroat Tr. 385:3–389:8, 525:1–527:22.

[242] R. M. DeGroat Tr. 525:1–527:22; A. J. DeGroat Tr. 614:23–615:9.

2013 POA in the presence of a witness and notary, the latter of whom documented, and later testified, that Richard did so as a free and voluntary act.[243] The same month that he signed the POA, Richard undisputedly moved to Forwood Manor of his own free will, after careful consideration. Dr. O'Brien's January 2013 note also supports Richard's competency.[244] Dr. O'Brien testified that he believed his note would have supported Richard being competent to execute a will.[245] To Richard, Lucinda was a natural choice to be his formal agent: she was more involved than Michael in Richard's life, and appeared to be helping him.

Lucinda has asserted she and Richard had many agreements. The terms of their 2007 divorce and the 2013 Verbal Agreement are not as she said they were. But with regard to the 2013 deed and 2013 POA, I conclude Richard and Lucinda had an agreement. Richard reached out to Lucinda to ask for her assistance; as his family testified, Richard would not have done something he did not want to do.[246] Upon Lucinda reentering Richard's life, they agreed that Richard would execute

---

[243] PTO ¶ 2 at 12; JX 68 at Papa 246; Beers Dep. 29:9–31:5, 42:4–11, 53:8–57:23.

[244] JX 16 at DeGroat 1197.f

[245] JX 16 at DeGroat 1197; O'Brien Dep. 36:8–10, 36:20–37:22, 38:22–41:8, 41:20-22, 77:18-22. While Plaintiffs attack Dr. O'Brien's note as unsupported and as given without context, I find Dr. O'Brien, as Richard's primary care physician, had an adequate basis for his opinion and knew that he was writing the note to support Richard's ability to make his own decisions.

[246] JX 32; Papa Tr. 850:15–19, 961:7–10; Iacovetti Tr. 747:15–17.

the new deed in exchange for Lucinda assisting him with his affairs.[247]  Lucinda made herself indispensable in 2013, and by the end of that year, Richard documented her role by signing the 2013 POA.

Although Richard's memory and ability to drive were deteriorating in 2013, Richard's mental state in December 2013 meets the low standards for testamentary capacity.[248]  Richard was capable of exercising thought, reflection, and judgment.[249] The preponderance of the evidence, including testimony about Richard's capacity and Michael's contemporaneous acceptance of the document, establishes the 2013 POA as valid.[250]

Thus, Lucinda owed fiduciary duties to Richard starting on January 1, 2013, when she became his common law fiduciary, through execution of the 2013 POA, until his death.

## 2. Lucinda Has Failed To Show Her Self-Dealing Transfers Were Fair.

---

[247] JX 32; JX 40 at Papa 212–214; JX 42; JX47 at 274.

[248] *See In re West*, 522 A.2d at 1263.

[249] *See id.*

[250] Neither Dr. Carol Tavani nor Dr. Sam Romirowsky are cited to establish Richard's capacity since both of these experts' opinions had significant flaws, including failing to consider all of the relevant evidence.  Both experts selectively molded a narrative of Richard's decline that suits their clients' litigation position and the experts' areas of expertise. I rely only on contemporaneous accounts and evidence of Richard's mental state at the time he executed both the 2013 POA and the new deed for the Property.

As Richard's fiduciary, Lucinda owed him a duty of loyalty obligating her to act in his best interests.[251] Plaintiffs assert she breached that duty. Lucinda bears the burden of proving her self-dealing transactions were fair, and has failed to do so.

"An attorney-in-fact who uses the power given to him by the principal to transfer assets to himself has committed improper self-dealing, absent the voluntary and knowing consent of the principal."[252] "A self-dealing transfer of the principal's property to the attorney-in-fact is voidable in equity unless the attorney-in-fact can show that the principal voluntarily consented to the interested transaction after full disclosure. A self-dealing transfer is voidable."[253] Selling a principal's real estate and placing the proceeds into the agent's bank account is considered self-dealing.[254] The burden of proof is on the agent to prove that a self-interested transaction involving the principal is valid.[255] The agent's burden of establishing the fairness of the transaction "increases significantly" if the principal receives no consideration.[256]

---

[251] *Coleman v. Newborn*, 948 A.2d 422, 429 (Del. Ch. 2007).

[252] *Pennewill v. Harris*, 2011 WL 691618, at *3 (Del. Ch. Feb. 4, 2011).

[253] *Coleman*, 948 A.2d at 429.

[254] *Pennewill*, 2011 WL 691618, at *4.

[255] *Id.* at *3.

[256] *Coleman*, 948 A.2d at 432.

Lucinda contends she was the rightful beneficiary of Richard's retirement accounts and more liquid funds under her undocumented agreements with Richard at the time of their divorce and in 2013. As explained, the preponderance of credible evidence does not support a finding that either agreement existed. Lucinda cannot look to these agreements to validate her self-dealing.

Lucinda did not produce any documentation or witnesses to justify or explain any of her self-dealing financial transactions.[257] This Court has disavowed arguments that a fiduciary cannot account for her actions because she has given away the receipts: "she made no effort to obtain bank records or copies of receipts or bills from the relevant entities or individuals. She offered no other evidence, such as affidavits from persons she claims to have paid in cash."[258] Lucinda also has failed to demonstrate that she had Richard's consent for any of these transactions or that she disclosed these transactions to Richard.[259] Lucinda's bare explanations do not suffice to fulfill her fiduciary evidentiary burden for either the Property's proceeds or Richard's funds.

### i. The Property

---

[257] Papa Tr. 949:2–952:1; Kane Tr. 655:17–656:5.

[258] *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12.

[259] *Supra* n. 131.

45

Lucinda's retention of the Property's proceeds was not fair. Lucinda sold the Property in October 2014 under her authority as Richard's power of attorney.[260] Lucinda prepared the Property for sale, telling the realtor that she was working with Michael and communicating with him throughout the price negotiations, when, in fact, she was not.[261] The 2013 deed giving Lucinda the right of survivorship was valid,[262] but Lucinda's handling of the proceeds while Richard was still alive constitutes self-dealing that Lucinda has not shown to be fair.

The preponderance of the evidence establishes the 2013 deed was a valid legal document. As explained, Richard agreed to execute it in exchange for Lucinda's help. Michael was aware of the new deed, had the opportunity to participate in the execution of the deed, and communicated with his father about the deed.[263] While Michael raised the spectre that Richard may not be competent,[264] Michael was intimately aware of Richard's thoughts about the deed during Richard's negotiations with Lucinda and ultimately did not object to the deed's execution.[265] In view of the rest of the evidence, I believe Michael raised

---

[260] PTO ¶ 2 at 13; JX 90 at DeGroat 532; JX 68.

[261] JX 83 at DeGroat 3369, 3372.

[262] PTO ¶ 2 at 11.

[263] JX 34 at Papa 17, 19, 24; Tavani Tr. 179:14–180:22; Papa Tr. 857:2–15; R. M. DeGroat Tr. 512:13–21, 516:3–12, 520:2–13.

[264] JX 34 at Papa 20.

[265] JX 34 at Papa 17, 19, 24; Tavani Tr. 179:14–180:22; Papa Tr. 857:2–15; R. M. DeGroat Tr. 512:13–21, 516:3–12, 520:2–13.

46

the issue of Richard's competence to caution Lucinda and in response to her inflammatory descriptions of Richard's attitude. Further, as discussed, Dr. O'Brien wrote a note supporting Richard's competency at that time and testified that he believed his note would have supported Richard being competent to execute a will.[266] Mr. Ferry oversaw the execution, and also saw no signs of undue influence or a lack of competence.[267] The 2013 deed is valid.

Lucinda owned the Property jointly with Richard, and $65,000 in repairs were paid for out of the Vanguard Joint Account as funded from Richard's solely owned accounts. But Lucinda wired all $402,000 in proceeds to herself and reimbursed her creditors, but not Richard.[268] Lucinda transferred the proceeds to eight bank accounts she owned individually and jointly, and gave Richard nothing. Her transfers included a $95,000 transfer to a family account she shared with her siblings to pay back the purported cash loan from her family's restaurant.[269] As

---

[266] JX 16 at DeGroat 1197; O'Brien Dep. 36:8–10, 36:20–37:22, 38:22–41:8, 41:20-22, 77:18-22.

[267] Ferry Dep. 87:14–89:3.

[268] JX 90 at DeGroat 531–532, 3678, 3972; D.I. 273; JX 119 at 1; Kane Tr. 653:22–23.

[269] JX 91 at DeGroat 2073; Papa Tr. 922:12–23. Lucinda also testified she paid an additional $23,000 to her family after this initial transfer of $95,000. Papa Tr.922:20–23. ("And then over the next month or so I got cash enough of $23,000 to replenish that into the safe, because every restaurant in the world has to have a cash reserve."). As I do not believe Lucinda took out a cash loan to pay for Property renovations, I need not evaluate the credibility of this testimony.

explained, Lucinda has failed to prove that she contributed $118,000 to renovations, much less that she did so through a loan from her family's business.

Lucinda also transferred $200,000 to her joint account with Ziatyk at Baycoast Bank,[270] which they used to pay off their Massachusetts property's home equity line of credit;[271] and $20,000 to a TD Bank account owned by Webasyst LLC, an entity for which Lucinda is the registered agent,[272] from which a transfer was immediately redirected to three accounts owned by Russian citizens.[273] Lucinda contends she and Richard agreed a few years before their divorce that she should receive approximately $250,000 from the Property proceeds, but failed to prove such an agreement.[274] Finally, Lucinda stated that $32,000 of the remaining proceeds were "to fund a payment against the [2013 Verbal Agreement]," which she has failed to prove existed.[275]

---

[270] JX 90 at BCB 49.

[271] Papa Tr. 1130:6–23.

[272] The Court takes judicial notice of the State of Delaware's website, particularly the Division of Corporations' online entity search database. *See In reBaxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995); State of Delaware, The Official Website of the First State, *Department of State: Division of Corporations,* https://icis.corp.delaware.gov/ecorp/entitysearch/namesearch.aspx (last visited Apr. 24, 2020).

[273] JX 90 at DeGroat 2883–2889.

[274] JX 113 at 6; Papa Tr. 828:6–20, 868:20–869:15, 990:9–18, 1132:5–17.

[275] Papa Tr. 1132:13–1133:4.

Lucinda has failed to show that her actions were fair in keeping the total sale proceeds from the Property transaction and reimbursing her creditors, to the exclusion of Richard. In selling the Property as Richard's fiduciary, Lucinda had a duty to ensure Richard received his share of the proceeds according to his joint ownership. But she kept the funds for herself, epitomizing an invalid self-interested transaction.

## ii. Richard's Funds

Lucinda has also failed to show that her self-dealing transfers from Richard's accounts were fair.[276] After obtaining power of attorney over Richard's

---

[276] This analysis excludes the Vanguard TODs and the Fidelity IRAs. On February 19, the Court issued an order granting Defendant's motion for summary judgment as to the Vanguard TODs for which Lucinda was always the fiduciary. D.I. 196 at ¶¶ 9, 14. Additionally, Lucinda remained the beneficiary of the Fidelity IRAs at all times until those funds were transferred to Vanguard in November 2013. JX 12; R. M. DeGroat Tr. 540:12–543:16; Papa Tr. 877:7–13, 878:6–22, 885:17–886:11.

Lucinda transferred the Fidelity IRAs to Vanguard only after she gained online access to Richard's Vanguard accounts to view his beneficiary statements, completed paperwork to become the power of attorney on all of his Vanguard accounts, changed the mailing address to the Property for all of his Vanguard accounts, and made herself the primary beneficiary of the Vanguard IRAs. JX 52; JX 53; JX 56 at VGI 1305, 1311, 1375; JX 130 at Papa 789–95; Papa Tr. 893:3–894:9; R. M. DeGroat 544:12–18. As explained herein, Lucinda breached her fiduciary duties by making herself the beneficiary to the Vanguard IRAs. But the transfer of the Fidelity funds to Vanguard was not a breach. And because Lucinda had always been the beneficiary of the Fidelity IRAs, the transfer of those funds to the Vanguard IRAs did not result in an unjustified enrichment for Defendants or an impoverishment for Plaintiffs.

The transfer from Fidelity to Vanguard illustrates the extent of Lucinda's control over Richard's financial affairs. Lucinda had previously suggested Richard move the Fidelity IRAs to his Vanguard IRAs for better returns, but the change did not occur until Lucinda was in the driver's seat. Papa Tr. 899:14–22. Lucinda's actions in this regard were not befitting of an ideal fiduciary, but at bottom, she was always the beneficiary of

49

Vanguard TODs, IRAs, and the Joint Account, and making herself the beneficiary of the IRAs, Lucinda helped herself to approximately $65,000 to repair the Property, thousands of dollars for "rent" that Richard did not owe, and over $200,000 for miscellaneous and undocumented reasons, including checks written with memo lines as undescriptive as "Transfer."[277] Lucinda continued with these self-interested transactions after Richard entered the hospital in 2015, transferring herself another $48,000 from the Vanguard Joint Account.[278]

Although Lucinda was a co-owner of the Vanguard Joint Account, entitling her to withdraw from this account, her self-dealing transactions began by transferring money out of Richard's individual accounts and IRAs, without his knowledge or consent, into the Vanguard Joint Account.[279] These originating transfers and her self-interested use of Richard's solely owned funds demonstrate her breaches of fiduciary duty.[280] Lucinda is only entitled to the funds that were in the Vanguard Joint Account prior to the first transaction she completed from

the Fidelity IRAs. She was entitled to those funds after Richard's death. The Court will not take those funds from her based on her mere movement of Richard's funds to a different bank where that move did not harm Richard and has not harmed Plaintiffs.

[277] JX 56 at VGI 686; JX 58 at VGI 4838; JX 60 at VGI 4839; JX 74 at VGI 4840; JX 78 at VGI 4846; JX 82 at VGI 4844, 4847; D.I. 273; JX 119.

[278] JX 108; JX 109; Papa Tr. 1067:7–1077:18.

[279] The evidence demonstrates Lucinda transferred funds into the Vanguard Joint Account herself and that these transactions continued after Richard was hospitalized. D.I. 272 at VGI 4876, 4878, 4880, 4882, 4886, 4890.

[280] *Pennewill v. Harris*, 2011 WL 691618, at *3–5 (Del. Ch. Feb. 4, 2011).

Richard's individual accounts and IRAs, in July 2013.[281] It appears there was only $7.91 in the Vanguard Joint Account before Lucinda seeded it from Richard's solely owned accounts.[282] During this time, Lucinda reassured Richard that she was handling his bills; instead, she was using her status as a fiduciary to loot Richard's assets.[283]

Lucinda also engaged in self-dealing transactions from Richard's Penn Mutual and Lincoln accounts. Richard purposefully removed her from these accounts in 2007,[284] but Lucinda used the 2013 POA to renew her access.[285] Lucinda liquidated the assets in the Penn Mutual and Lincoln accounts for her own use. She has offered no explanation as to why these transactions are fair to Richard, aside from stating it was Richard's idea to liquidate the accounts.[286]

Lucinda also used Richard's Chase credit card for numerous self-dealing transactions. Between 2013 and 2016, she completed hundreds of purchases on

---

[281] JX 56 at VGI 686; *see also* D.I. 272 at VGI 4876, 4878, 4880, 4882, 4886, 4890.

[282] JX 18 at 74–78; Papa Tr. 1101:7–13. The accounting ordered by the Court will accurately document these amounts.

[283] JX 59 at Papa 229.

[284] JX 6; JX 7.

[285] JX 94; JX 95.

[286] Papa Tr. 919:5–921:3. The liquidations did not occur until April and July 2015, a few months before Richard's fall, which led to his hospitalization, at which time he was suffering from dementia. JX 100; JX 103; JX 106 at DeGroat 1298–1299, 1301. Richard did not have the ability to make these types of financial decisions at that time. JX 16 at Degroat 1119, 1201; O'Brien Dep. 44–45; JX 117; Tavani Tr. 140:19–24; JX 120; Romirowsky Tr. 264:10–265:9.

that card totaling approximately $70,000. The Chase credit card statements show thousands of dollars spent at women's clothing stores, florists, and liquor stores.[287] There are dozens of expenses incurred in New York, New Jersey, and Massachusetts. There are numerous expensive dinners at restaurants in New Jersey, Massachusetts, and Pennsylvania, including multiple charges to Lucinda's family restaurant in Jenkintown, PA.[288] There are airline purchases to Florida on Richard's credit card, made contemporaneously with Lucinda flying to Florida for her wedding anniversary with Ziatyk.[289] There are thousands of dollars charged for rental cars for Lucinda renting cars for extended amounts of time.[290]

Lucinda admits that she possessed Richard's credit card, but offers almost no explanation for the expenses aside from stating Richard gave it to her to use for "expenses to come see him. . . and if [she] would buy things for the house" and that he was in control of the credit card because the statements were delivered to the Property.[291] Lucinda has failed to meet her onerous burden of showing these transactions were fair, or made with Richard's knowledge or consent.

---

[287] JX 118.

[288] JX 118.

[289] JX 118; *see also* Ziatyk Tr. 1278:2–16.

[290] JX 118.

[291] Papa Tr. 917:19–918:10. As with the Vanguard statements, I do not infer that Richard received notice of Lucinda's actions from the fact that statements were mailed to his home.

Finally, Lucinda made herself the beneficiary of Richard's Vanguard accounts in contravention of his intent. In 2010 and 2011, Richard tried to remove Lucinda as the beneficiary from all of his accounts. Lucinda benefits where Richard did not succeed: she remained the beneficiary of the Fidelity IRAs and Vanguard TODs.

But where Richard did succeed, he intended his assets to flow to Jan and Carroll. Lucinda contravened those wishes by making herself the beneficiary of the Vanguard IRAs in a self-dealing transaction.[292] While Lucinda denies making herself the primary beneficiary,[293] the preponderance of the evidence shows she did. Lucinda admitted to updating the mailing address for the Vanguard Joint Account accounts online three days later.[294] The following summer, Lucinda also informed Michael that she added him as the secondary beneficiary for the Vanguard IRAs and TODs.[295] As explained, Lucinda, not Richard, made all the online transactions. Richard did not consent to her actions. In fact, Lucinda directly contradicted Richard's wishes in this self-dealing transaction. Other than

---

[292] JX 56 at VGI 1375–1376. Lucinda also admits to adding Michael as the secondary beneficiary to Richard's Vanguard accounts in August 2014. JX 85 at VGI 1381–1382; JX 86 at Papa 494.

[293] Papa Tr. 887:11–16, 892:12–18, 893:3–894:3.

[294] JX 1 at VGI 1375; Papa Tr. 1040:17–21.

[295] JX 85 at VGI 1381–1382; JX 86 at Papa 494.

her unsubstantiated denial, Lucinda has offered no explanation as to why doing so would have been fair to Richard.

When Lucinda became Richard's fiduciary, she assumed the obligation to act in his best interest. Lucinda instead acted in her own self-interest, and has breached her fiduciary duty of loyalty. Lucinda cannot prove the self-dealing transactions she completed with Richard's funds from January 2013 through his death were fair. Without Richard's knowledge or consent, she retained his 2012 RMD; kept or paid debts with the entire sale proceeds from the Property transaction; repeatedly seeded the Vanguard Joint Account from Richard's solely-owned accounts and then transferred those funds to herself; liquidated his Penn Mutual and Lincoln life insurance policies; used Richard's Chase credit card at her discretion without justification; and overrode his wishes by making herself the beneficiary of the Vanguard IRAs. On every front, Lucinda has failed to demonstrate that Richard consented to these transactions or that they were otherwise fair. She has breached her common law fiduciary duties.[296]

### 3. After The 2013 POA Was Executed, Lucinda Breached Her Duties Under The POA Act.

Plaintiffs have proven Lucinda breached her common law fiduciary duties for January 2013 through Richard's death. By logical extension, Plaintiffs have

---

[296] *Pennewill*, 2011 WL 691618, at *3–5; *Coleman*, 948 A.2d at 429–432.

also proven that Lucinda violated her statutory duties under the POA Act after the 2013 POA was executed.

Lucinda's actions prior to the December 2, 2013 execution of the 2013 POA do not fall within the scope of the POA Act. "The POA Act regulates the conduct of an agent who has undertaken to act on behalf of the principal pursuant to an executed durable personal power of attorney. It does not regulate the conduct of an individual who has not been appointed as an agent under such a document, even if that individual is otherwise an agent of the principal."[297] Therefore, no Plaintiff has standing under the POA Act to pursue judicial relief for transactions that occurred prior to December 2013 including, but not limited to, Lucinda's July 2013 substitution of herself and the removal of Carroll as beneficiary on the Vanguard IRAs.

As Richard's personal representative and beneficiary of his estate, Michael has standing to assert Lucinda breached her duties under the POA Act.[298] Carroll also has standing as a beneficiary.[299] Plaintiffs' viable claims under the POA Act are limited to injuries to Richard's estate, Michael as beneficiary, and Carroll as beneficiary by Lucinda's acts after the 2013 POA's December 2 execution.

---

[297] *In re Corbett v. Corbett*, 2019 WL 6841432, at *7 (Del. Ch. Dec. 12, 2019) (ORDER); *see also* 12 *Del. C.* §§ 49A-102(1), 49A-114.

[298] JX 19; *In re Corbett*, 2019 WL 6841432, at *7.

[299] JX 19; *In re Corbett*, 2019 WL 6841432, at *7.

Specifically, the sale of the Property, the expenditures and transactions from the Vanguard Joint Account, and the expenditures on Richard's Chase credit card are at issue under the POA Act.

So bracketed, the facts that underpin Lucinda's common law fiduciary duty breaches prove she also breached the POA Act. Lucinda abused her position as Richard's agent.[300] She did not act in good faith, nor did she act loyally for Richard's benefit.[301] She failed to act with "the care, competence, and diligence ordinarily exercised by agents in similar circumstances" and failed to "keep a record of all receipts, disbursements, and transactions made on behalf" of Richard.[302] She also failed to "not act in a manner inconsistent with [Richard's] testamentary plan."[303] Lucinda breached her duties under the POA Act for the transactions that injured Richard's estate, as well as Michael and Carroll as beneficiaries.

### B. Lucinda And Ziatyk Were Unjustly Enriched.

Delaware courts have recognized that unjust enrichment claims may be nearly duplicative of fiduciary claims, but that Delaware law does not bar both

---

[300] 12 *Del. C.* § 49A-114.

[301] *Id.* at § 49A-114(a)(2), (b)(1).

[302] *Id.* at § 49A-114(b)(3)–(4).

[303] *Id.* at § 49A-114(b)(6).

claims from proceeding.[304]  When an unjust enrichment claim relies upon a breach

of fiduciary duty, a successfully pled breach of fiduciary duty claim likely supports

a well-pled claim for unjust enrichment.[305]  Plaintiffs' claim for unjust enrichment

hinges on the same self-interested transactions that underpin Lucinda's breaches of

fiduciary duty.  Plaintiffs have successfully proven breaches of fiduciary duty, and

as analyzed below, have correspondingly proven a claim for unjust enrichment.  To

make perfectly plain that Lucinda has done wrong, this post-trial opinion considers

both the breach of fiduciary duty and unjust enrichment claims, even though

Plaintiffs are entitled to only one recovery.[306]

Lucinda's management of Richard's financial affairs from 2013 through

2016 unjustly enriched her and Ziatyk.  "Unjust enrichment is the unjust retention

---

[304] *Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011) ("Plaintiffs' claims against NSC's Control Group for direct equity dilution and unjust enrichment appear to be duplicative, and both parties appear to recognize this fact. Nonetheless, Delaware law does not appear to bar bringing both claims."); *Tornetta v. Musk*, 2019 WL 4566943, at *15 (Del. Ch. Sept. 20, 2019) (providing Delaware law does not bar bringing both claims "factual circumstances [might exist] in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical").

[305] *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010) ("If MCG is able to prove Maginn breached his duty of loyalty in Count Five then it will also be successful in proving unjust enrichment in Count Six.  Both claims hinge on whether Maginn was disloyal to Jenzabar by the manner in which he procured the 2002 Bonus."); *see also Monroe Cty. Employees' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) (noting the unjust enrichment claim must be dismissed because it "depends on the success of the breach of fiduciary duty claim," which was unsuccessfully pled).

[306] *See MCG Capital Corp.*, 2010 WL 1782271, at *25 n.147; *Dubroff*, 2011 WL 5137175, at *11.

57

of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[307] I will take each element in turn.

Lucinda and Ziatyk were enriched by approximately $830,000. Lucinda received the following approximate amounts, subject to an accounting: Richard's half of $402,000 from the sale of the Property;[308] at least half of the $65,000 from the Vanguard Joint Account for Property renovations;[309] at least $18,000 of Richard's 2012 RMD;[310] $252,000 in checks written from Richard's individual Vanguard accounts, IRAs and the Joint Account, subject to any funds Lucinda is entitled to as a joint owner of the Vanguard Joint Account as discussed above;[311] $50,000 from cashing in or borrowing against Richard's insurance policies;[312]

---

[307] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[308] JX 90 at DeGroat 531–532, 3678, 3872; D.I. 273; JX 119 at 1.

[309] R. M. DeGroat Tr. 424:23–425:2; Kane Tr. 654:1–7; D.I. 273; JX 119 at 1. The funds for the renovation originated from Richard's solely owned accounts, and the renovation began after Richard moved to Forwood. Whether Richard rightly paid for half of the renovations remains an open question, to be resolved after the accounting.

[310] JX 48 at VGI 4512.

[311] JX 119 at 3.

[312] JX 94; JX 95; JX 100; JX 103; Papa Tr. 1065:4–1066:18.

$69,000 in expenses on Richard's credit card;[313] and approximately $207,000 transferred after Richard's death in accordance with improper beneficiary designations.[314] As a direct result, Richard's estate and his rightful beneficiaries experienced an impoverishment.

Lucinda and Ziatyk lack justification for their enrichment. Lucinda argues that she is justified in keeping Richard's assets for a variety of reasons including: (i) a claim that Richard was legally obligated to leave all of his money to Lucinda due to the verbal divorce agreement, as allegedly restated in 2013; (ii) that Richard voluntarily transferred the assets to her; (iii) that Lucinda obtained and paid substantial amounts of cash to unknown and undocumented contractors, and so should be reimbursed; and (iv) a claim that Richard would change his beneficiary designations when he was mad at Lucinda throughout the years, but restored her status in his final years because he reignited his relationship with her while his relationships with Jan and Carroll continued to decline. None of these reasons are supported in fact, and none justify Lucinda's retention of Richard's assets. Rather, as explained, Lucinda took the assets without Richard's authorization and against his intent.

---

[313] JX 118.

[314] JX 112; JX 124. This number, $207,000, is the result of subtracting the $439,000 that was transferred from the Fidelity IRAs to the Vanguard IRAs in November 2013 from the total amount in the Vanguard IRAs at Richard's death, which was approximately $646,000. Papa Tr. 877:7–13, 878:6–22, 885:17–886:11.

Plaintiffs have also demonstrated an absence of justification for Ziatyk's enrichment flowing from Lucinda's transfers of Richard's funds. Ziatyk admits that he has benefitted from approximately $329,000 from Richard's assets, which Lucinda transferred directly to their joint home equity line of credit.[315] "Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer."[316] Lucinda and Ziatyk were unjustly enriched and are not entitled to retain this enrichment. Plaintiffs do not have an adequate remedy at law; no contract governs their relationship with Defendants.[317]

Both the breach of fiduciary duty claims and the unjust enrichment claim hinge on Lucinda's self-interested transactions with Richard's assets. Lucinda cannot demonstrate the transactions at issue were entirely fair, nor can she and Ziatyk substantiate any justification for those transactions. Plaintiffs are entitled to one recovery.[318]

### C. Plaintiffs Are Entitled To An Accounting And A Constructive Trust.

An accounting "is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of judgment for the amount ascertained

---

[315] Ziatyk Tr. 1286:6–13.

[316] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

[317] *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 (Del.Ch. May 16, 2007).

[318] *See MCG Capital Corp.*, 2010 WL 1782271, at *25 n.147; *Dubroff*, 2011 WL 5137175, at *11.

to be due to either as a result."[319]  As such, an accounting is dependent on other substantive claims:  it is not a stand-alone cause of action.[320]  "An accounting. . . is a means of measuring the benefits bestowed on an unjustly enriched defendant."[321] Lucinda's breaches of her fiduciary duties to Richard also give rise to an accounting as a matter of law.[322]  Plaintiffs are entitled to an accounting to remedy Lucinda's breach of fiduciary duty, violation of the POA Act, and her unjust enrichment together with Ziatyk.

In holding that a fiduciary must account for her actions, the Court has stated, "[r]egardless of the source of the fiduciary authority," *i.e.* through a formal power of attorney or common law fiduciary duties, a fiduciary is "still required. . . to use his principal's property for her benefit only and to act scrupulously in her regard."[323]  The POA Act permits "upon the death of the principal" a "personal

---

[319] *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

[320] *Rhodes v. Silkroad Equity, LLC,* 2007 WL 2058736, at *11 (Del. Ch. Jul. 17, 2007) ("An accounting is not so much a cause of action as it is a form of relief ... inherently dependent on. . . [other] claims."); *Stevanov v. O'Connor,* 2009 WL 1059640, at *15 (Del. Ch. Apr. 21, 2009) ("A claim for an accounting in the Court of Chancery generally reflects a request for a particular type of remedy, rather than an equitable claim in and of itself.").

[321] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1063 (Del. 1988); *see also Prospect St. Energy, LLC v. Bhargava*, 2016 WL 446202, at *8 (Del. Super. Ct. Jan. 27, 2016).

[322] *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12; *Matter of Lomax*, 2019 WL 4955315, at *5 (Del. Ch. Oct. 9, 2019).

[323] *IMO Estate of Dean,* 2014 WL 4628584, at *2.

representative or successor in interest of the principal's estate" to request an accounting.[324] "If so requested the agent shall comply with the request within a reasonable period of time."[325] The Court may also order an accounting under the POA Act for all transactions completed on the principal's behalf after execution of a POA.[326] The Court has not permitted fiduciaries to excuse themselves of this obligation with informal or incomplete accountings: "[a fiduciary] cannot excuse her own failure to maintain records in a safe place, nor can she rely on a narrative and answers to deposition questions as a substitute for a formal accounting. [A fiduciary] is required to provide a formal accounting."[327]

Lucinda's 2016 summary[328] and excuses for lack of documentation are not satisfactory.[329] As a fiduciary and an individual unjustly enriched, Lucinda is required to provide an accurate accounting from the time she was a common law fiduciary. Plaintiffs are entitled to a declaration that Lucinda's past accounting was incomplete, and to a new accounting to properly assess damages.[330]

---

[324] 12 *Del. C.* § 49A-114(g).

[325] *Id.*

[326] *Id.*

[327] *In Matter of Estate of Dougherty*, 2016 WL 4130812, at *12.

[328] JX 113.

[329] Papa Tr. 949:2–952:1; Kane Tr. 655:17–656:5.

[330] D.I. 275 at 59:2–7 (B. Ferry: "A request as specified in our post-trial briefing is no longer for an accounting. We are indicating that Lucinda Papa has accounted and that her

Plaintiffs failed to pursue a constructive trust or equitable lien in post-trial briefing.[331] Irrespective of this misstep, this Court has the discretion and duty to fashion the most equitable remedy. Lucinda, "by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom … she owe[d] some duty."[332] Accordingly, I conclude that a constructive trust over the misappropriated funds, including those paid to Defendants' creditors, is necessary.[333] The constructive trust will be applied retroactively dating back to each wrongful act.[334] Where a dispute exists as to the location or existence of particular funds, the aforementioned accounting will assist in identifying funds that have been dispersed and paid to creditors. Where funds have been dissipated, the Court remains able to impose a surcharge, compensatory damages, or a personal judgment.[335]

---

accounting has failed and, therefore, we are requesting a judgment for the amount which is unaccountable.").

[331] D.I. 1 at 14, 170 at 17, 260 at 73.

[332] *Hogg v. Walker,* 622 A.2d 648, 652 (Del. 1993).

[333] *Id.* at 652 ("The doctrine of constructive trust effectuates the principle of equity that one who would be unjustly enriched, if permitted to retain property, is under an equitable duty to convey it to the rightful owner. It is an equitable remedy of great flexibility and generality, and is viewed as 'a remedial [and] not a substantive' institution."); *id.* at 654 ("[T]he fact that the *res* of the trust was dissipated does not foreclose an equitable remedy to make [plaintiff] whole.).

[334] *Id.* at 652 (noting "the duty to transfer the property relates back to the date of the wrongful act that created the constructive trust").

[335] *Id.* at 654.

**D.** **Lucinda Did Not Unduly Influence Richard; She Simply Took His Assets.**

This litigation turns on Lucinda's self-dealing as a fiduciary and unjust enrichment. On these claims alone, Plaintiffs are granted the relief they desire. But, Plaintiffs also contend that Richard lost testamentary capacity by 2013 at the latest, and that Lucinda exercised undue influence over Richard such that the following should be voided: the 2013 deed; 2013 POA; changes to the Vanguard IRA, Penn Mutual, and Lincoln Financial beneficiary designations; the hundreds of thousands of dollars transferred out of Richard's Vanguard accounts into the Vanguard Joint Account, and subsequently, Lucinda's pocket; and the Chase credit card transactions.

The elements of undue influence are: "(1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and (5) a result demonstrating its effect."[336] "Undue influence occurs when a party exerts immoderate influence under the circumstances that overcomes the transferor's free will, resulting in a transfer that is not of her own choice and mind."[337] For influence to be undue, it must rise to the level as to "subjugate [the actor's] mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a

---

[336] *See Sloan v. Segal* (*Sloan II*), 2010 WL 2169496, at *7 (Del. 2010) (TABLE).

[337] *Mitchell*, 2009 WL 132881, at *8.

64

[document or transfer] that speaks the mind of another and not his own."[338]  The party claiming a document or transfer was the product of undue influence "must show that the testator's mind was overcome by the influencer."[339]

The evidence, as analyzed in Section II(A)(2)(i), proves that Michael was aware of the new deed, had the opportunity to participate in the execution of the deed, and communicated with his father about the deed.[340] The preponderance of the evidence, including Michael's contemporaneous belief that Richard executed the deed voluntarily, precludes a finding that Lucinda unduly influenced Richard to execute the new deed.   Plaintiffs have failed to establish the actual exertion of undue influence for this transaction.

The evidence, as analyzed in Section II(A)(1), further establishes that Lucinda did not unduly influence Richard to execute the 2013 POA.   Michael testified that he is no longer challenging the 2013 POA.[341]  To the extent Plaintiffs continue to assert that the 2013 POA was executed as a result of Lucinda's undue

---

[338] *Sloan II*, 2010 WL 2169496, at *7 (quoting *In re Estate of West,* 522 A.2d at 1263).

[339] *Will of Nicholson*, 1998 WL 118203, at *3 (Del. Ch. Mar. 9, 1998); *see Sloan v. Segal (Sloan I)*, 2009 WL 1204494, at *13 (Del. Ch. Apr. 24, 2009) (noting challenging party bears the burden of proving undue influence absent special circumstances), *aff'd*, 996 A.2d 794 (Del. 2010) (TABLE).  This burden shifts "under factual situations that lack implicit ethical safeguards." *Sloan I*, 2009 WL 1204494 at *13 (internal quotation marks omitted) (quoting *In re Will of Melson,* 711 A.2d 783, 787 (Del. 1998)).

[340] JX 34 at Papa 17, 19, 24; Tavani Tr. 179:14–180:22; Papa Tr. 857:2–15; R. M. DeGroat Tr. 512:13–21, 516:3–12, 520:2–13.

[341] R. M. DeGroat Tr. 575:20–576:2.

influence on Richard, they have failed to prove that by a preponderance of the evidence. Lucinda used her power as Richard's agent in her self-interest, breaching her fiduciary duties, but Lucinda did not unduly influence Richard to execute the deed or 2013 POA.

After the execution of the new deed and the 2013 POA, even assuming Richard lost capacity, Lucinda administered Richard's financial affairs without his involvement. Lucinda, not Richard, changed the Vanguard IRA, Penn Mutual, and Lincoln Financial beneficiary designations; transferred hundreds of thousands of dollars out of Richard's Vanguard accounts into the Vanguard Joint Account, and subsequently, her pocket; and completed numerous Chase credit card transactions for her own personal expenses. Lucinda did not act through Richard by subjecting his will to her own: she simply did what she wanted with his funds.

Assuming Richard was susceptible, that Lucinda had the opportunity to exert influence over him, and that she had the disposition to do so for an improper purpose, Lucinda effectuated the transactions at issue not by subjugating Richard's mind to her will, but by simply taking what she wanted without his knowledge or consent. Although Lucinda's conduct resulted in breaches of fiduciary duty and Defendants' unjust enrichment, the evidence is inconsistent with a claim of undue influence. The claim for undue influence is denied.

66

## E. Plaintiffs Are Not Estopped From Making Claims To The Vanguard IRA.

Lucinda has argued Plaintiffs are estopped from making claims to the Vanguard IRA because of Lucinda's marital financial agreement with Richard. This argument is legally and factually flawed. "In order to establish a claim for promissory estoppel, plaintiff must show *by clear and convincing evidence* that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[342]

Lucinda has not alleged that Plaintiffs made any promise to her or Richard; indeed, they made none. Instead, she contends that Richard's alleged promises to her, *i.e.* the marital financial agreement and 2013 Verbal Agreement, forecloses Plaintiffs' ability to make claims on the Vanguard IRA. Without evidence that Plaintiffs made a promise, promissory estoppel cannot preclude their claims. Plaintiffs cannot have had the "reasonable expectation. . . to induce action or

---

[342] *CSH Theatres, LLC v. Nederlander of S.F. Assocs.*, 2015 WL 1839684, at *20 (Del. Ch. Apr. 21, 2015) (emphasis in original) (quoting *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

forbearance" on Lucinda's part without making her a promise.[343]  Plaintiffs are not

estopped from making claims on the Vanguard IRA.

Further, as explained, Lucinda has failed to establish that the marital

financial agreement or 2013 Verbal Agreement existed.[344]  "The failure to prove a

real promise is fatal to [a claim for promissory estoppel]. . . the doctrine of

promissory estoppel can never operate unless a real promise is in existence."[345]

"Promissory estoppel 'requires a real promise, not just mere expressions of

expectation, opinion, or assumption.'"[346]  Lucinda has failed to prove any promise,

much less one by Plaintiffs, that would support a defense of promissory estoppel.

---

[343] *CSH Theatres, LLC*, 2015 WL 1839684, at \*20 (emphasis in original) (quoting *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)).

[344] JX 18 at 77 ("And it's mentioned in the divorce papers that the – there was no money amount transferred or one with the divorce, but the divorce papers indicate that the – that the financial arrangements were all not part of the divorce.  The divorce says that they were agreed upon by the parties in the divorce.  So that's – that's all I – that's all I have.  But, see, nothing does me any good if I can't locate the party that's on the – you know, the account.  And I'm afraid she's – I'm afraid, if her name is here, she can withdraw anything that's in that account."); JX 23 at 138–139 ("And I'm trying to remove a person -- an ex-wife, really. . .   And make sure that she has no way of getting her hands on any money that's in those funds. . .   We're divorced and we had an agreement -- not part of the divorce, but a -- the divorce mentions a -- that we have -- we being my ex-wife and myself. . . A financial agreement, which we do. . . But now I'm trying to make sure that there's no way she can go back and grab money in any of these funds.").

[345] *Metro. Convoy Corp. v. Chrysler Corp.*, 208 A.2d 519, 521 (Del. 1965).

[346] *James Cable, LLC v. Millennium Dig. Media Sys., L.L.C.*, 2009 WL 1638634, at \*5 (Del. Ch. June 11, 2009) (quoting *Addy v. Piedmonte,* 2009 WL 707641 (Del. Ch. Mar. 18, 2009)).

**F.    Lucinda Waived Some Of Her Counterclaims By Failing To Present Evidence On Them At Trial And Has Failed To Prove The Others.**

Lucinda asserts a variety of claims in her Counterclaim, but has failed to present evidence on many of these claims and has failed to prove all of them.[347] Lucinda asserts that in 2008, she and Richard agreed that his assets, including all of his Vanguard accounts, Penn Mutual insurance proceeds, his Artisan Bank account, his AETNA Insurance proceeds, his Connecticut General Life proceeds, and the Property, would devise to her upon his death.[348] As explained, Lucinda has failed to prove the existence or terms of this agreement. Further, Lucinda's testimony about this agreement is inconsistent with her allegations.[349] She testified that the Lincoln Financial accounts were not a part of this agreement,[350] and evidence proves that she was never named as a beneficiary to the Artisan Bank account.[351] Moreover, the AETNA and Connecticut General accounts no longer exist.[352] Lucinda has failed to prove that the marital financial agreement existed either in 2008 or at any other time. Her counterclaim seeking the enforcement of this agreement is denied.

---

[347] D.I. 200.

[348] D.I. 200 ¶1.

[349] Papa Tr. 971:10–972:19, 1027:18–1028:20.

[350] Papa Tr. 982:9–12.

[351] JX 126.

[352] Papa Tr. 919:5–920:4; R. M. DeGroat Tr. 410:7–8.

Likewise, Lucinda's counterclaim that Richard breached the divorce agreement by not naming her as a beneficiary and/or co-owner of the aforementioned assets also fails.[353] Lucinda did not present evidence on this claim at trial and only references the claim briefly in post-trial briefing.[354] Thus, this claim was waived.[355] In addition, I have found the divorce agreement did not exist.

Lucinda has also failed to prove her counterclaim for promissory estoppel by Richard by not presenting any evidence on this claim.[356] Lucinda argued that in the alternative of a breach of the divorce agreement, Richard would be estopped from retitling or changing beneficiary designations of the aforementioned assets to anyone other than Lucinda.[357] Lucinda has not established that any such promises existed to support an estoppel claim.

Lucinda's "claim against the estate" and tortious interference claims are also unsuccessful.[358] In the alternative to her breach of contract and promissory estoppel claims, Lucinda pled that she should be entitled to a claim against

---

[353] D.I. 200 ¶ 3.

[354] D.I. 259 at 14–15.

[355] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *35 (Del. Ch. Aug. 13, 2015), *aff'd sub nom.* 157 A.3d 152 (Del. 2017); *Owen v. Cannon*, 2015 WL 3819204, at *32 (Del. Ch. June 17, 2015); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *14 (Del. Ch. Apr. 20, 2015).

[356] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *35; *Owen*, 2015 WL 3819204, at *32; *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *14.

[357] D.I. 200 ¶ 4.

[358] D.I. 200 ¶¶ 6–7.

70

Richard's estate for the repairs and time she expended on the Property, and all the care she provided for Richard.[359] She also argued that Plaintiffs became aware of the marital financial agreement and tortiously interfered with this longstanding agreement.[360] Lucinda failed to successfully prove either of these claims. The marital financial agreement was never proven to exist, and Lucinda failed to establish any entitlement to Richard's estate for the care she offered him or her time working on the Property. Lucinda presented little to no evidence on these claims at trial.[361]

Lastly, the counterclaim asserting damages for Plaintiffs' alleged freezing of all of Richard's Vanguard accounts (excluding the Vanguard Joint Account) and all of Lucinda's personal accounts is meritless to the point of being frivolous ("Vanguard Account Counterclaim").[362] Lucinda alleges that she has suffered $47,438.70 in damages as a result of Plaintiffs freezing Richard's Vanguard accounts after he died.[363] But Plaintiffs did not freeze the accounts, and the damages did not flow from the freeze; Lucinda knew both of those facts.

---

[359] D.I. 200 ¶ 6.

[360] D.I. 200 ¶ 7.

[361] *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *35; *Owen*, 2015 WL 3819204, at *32; *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846, at *14.

[362] D.I. 200 ¶¶ 12–14; JX 130 at Papa 233–234.

[363] D.I. 200 ¶ 14; Papa Tr. 934:11–17.

Vanguard froze the accounts, stating, "Given the competing claims, Vanguard has placed a freeze on the Assets pending receipt of evidence that these competing claims regarding the proper beneficiaries of the Assets are being pursued. . . ."[364] Lucinda was aware of this fact, having called Vanguard a few days after the accounts were frozen.[365] Vanguard told Lucinda, "The assets for Mr. DeGroat that you took into your own account are being disputed. We have to freeze them. Legally we have to freeze them. You don't have access to them."[366] Lucinda also knew that Plaintiffs were willing to unfreeze Lucinda's accounts, but that Vanguard declined the request due to the dispute over the accounts.[367]

The damages Lucinda contends flowed from the freeze are also disingenuous. The purported damages are the capital losses Lucinda incurred in liquidating her all of her Vanguard investments, including her individual accounts, on October 3, 2016.[368] Lucinda voluntarily incurred these losses when she sold her Vanguard investments, including the recently unfrozen assets, one day after the freeze was lifted from her accounts.[369] Lucinda mischaracterizes these losses as damages from the freeze while fully knowing they were incurred by her

---

[364] JX 130 at Papa 233–234.

[365] JX 122.

[366] JX 122 at 74.

[367] JX 122 at 73.

[368] D.I. 272 at VGI 3656.

[369] D.I. 272 at VGI 3658, 3659, 3662–3665.

subsequent decision to move the unfrozen funds out of Vanguard.[370] The Vanguard Account Counterclaim is denied.

Plaintiffs seek attorneys' fees from defending against this claim, classifying the claim as frivolous bad faith litigation. As examined below, Plaintiffs have carried their burden to establish the Vanguard Account Counterclaim is frivolous.

### G. Plaintiffs' Fees Defending The Vanguard Account Counterclaim Are Shifted; Defendants Will Bear Their Own Fees.

Delaware courts generally follow the American Rule, which holds litigants responsible for their own costs and fees.[371] "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[372] The Court recognizes an exception to this rule where a party has acted in bad faith.[373] "Delaware courts have previously awarded attorneys' fees where (for example) parties have unnecessarily prolonged or delayed litigation, falsified

---

[370] Papa Tr. 934:11–17; 1138:22–1141:14 (Q: And how are the plaintiffs responsible for you deciding to liquidate the account to get money out of there after Vanguard released the freeze that they put on the account? Papa: Because I wouldn't have had to get that money out that way except that you had frozen it. And the only way for me to get it out of there and get it safe was to take -- liquidate the account. And yes, there was margin in it, but I would not normally have had to do that except for you.").

[371] *See, e.g.*, *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[372] *Id.*

[373] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012); *see also Estate of Carpenter v. Dinneen*, 2008 WL 859309, at *17 (Del. Ch. Mar. 6, 2008).

records or knowingly asserted frivolous claims."[374] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[375] Delaware courts "have been vigorous in scrutinizing such fee requests, shifting fees only where bad faith is manifest, as where the litigation appears clearly vexatious or without a good-faith belief that the complaint or defense could reasonably be vindicated before our Courts, or where a fraud is worked on a litigant or the Court."[376] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[377]

Plaintiffs seek attorneys' fees from defending the Vanguard Account Counterclaim, classifying the claim as frivolous bad faith litigation. Plaintiffs have carried their burden in proving that Lucinda knowingly asserted a frivolous claim that "utterly lacked any legal or factual bases."[378] Lucinda continued to assert the

---

[374] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[375] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at *3 (Del. Ch. Dec. 29, 2010).

[376] *Horsey v. Horsey & Sons, Inc.*, 2016 WL 1274021, at *1 (Del. Ch. Mar. 21, 2016).

[377] *Johnston*, 720 A.2d at 546.

[378] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *21 (Del. Ch. Oct. 27, 2015), *judgment entered* 2015 WL 6508769, (Del. Ch. Oct. 27, 2015); *see also Nagy v. Bistricer*, 770 A.2d 43, 65 (Del. Ch. 2000) ("In this case, I conclude that several of the

Vanguard Account Counterclaim, and testified at trial to her position that Plaintiffs froze the Vanguard accounts, even though she knew that was not true.[379] Lucinda knew that Plaintiffs were willing to unfreeze the accounts, but that Vanguard, as a matter of policy, would not do so.[380] Additionally, although Lucinda testified at trial that the $47,438.70 loss was a result of her voluntary decision to liquidate all of her Vanguard accounts, including her individual accounts, after the accounts were unfrozen, she continued to assert the $47,438.70 as damages.[381] As discovery developed and it became clear, including to Lucinda, that the Vanguard Account Counterclaim was not as Lucinda alleged and Lucinda continued to adamantly assert that Plaintiffs froze the accounts and that she suffered $47,438.70 in

defendants' arguments were advanced with no reasoned basis in law or logic and therefore frivolously and in bad faith.").

[379] JX 122 at 73–74; JX 130 at Papa 233–234; Papa Tr. 1139:2–1140:10 ("Q: Do you know that Vanguard made the decision to freeze your accounts and only they had the authority to do that after Richard passed away? A: They did it on your demand, Mr. Ferry. Q: And that's something you're speculating about. A: No, they told me. They told me that they did it because – Q: Is there someone here from Vanguard to say that?. . . Q: I suspect that we'd find that Vanguard has told you that they made the decision, it was not me or anyone else, it was their decision to freeze the account. A: Based on the demand from you… Q: Do you have any proof of that here that somebody other than Vanguard made the decision to freeze your accounts. . . Do you have anybody who can testify to that? A: No.").

[380] JX 122 at 73.

[381] Papa Tr. 1140:12–1141:6 ("Q: What does that $47,438 represent? How do you arrive at that number? A: Vanguard sent me that amount on my October statement when they released the freeze on the assets. In order for me to get the money out of the account, I incurred 47,200-odd dollars of losses. Q: That was a margin loan transaction. Correct? A: No, it was not a margin loan transaction. It was to liquidate -- I had to liquidate the account to get the money out of there…. the only way for me to get it out of there and get it safe was to take -- liquidate the account.").

75

damages as a result. This is bad faith litigation.[382] Plaintiffs' attorneys' fees incurred in defending against the Vanguard counterclaim are shifted to Lucinda.

For her part, Lucinda accuses Plaintiffs of bad faith litigation based on the disparities between their initial allegations and the evidence that was presented at trial.[383] In particular, Lucinda contends that Plaintiffs falsely alleged that (i) Lucinda "moved" Richard out of the house, together with false descriptions of Forwood, (ii) Lucinda changed all of Richard's beneficiaries, (iii) Lucinda changed Richard's mailing address, and (iv) Lucinda initiated contact with Richard.[384] The fact that Plaintiffs' allegations were proven otherwise over the course of discovery does not prove the bad faith requisite to justify fee-shifting. These were factual disputes, not "clearly vexatious" or fraudulent acts by Plaintiffs. The allegation that Plaintiffs falsely claimed disinterested witnesses could testify about Lucinda's relationship with Richard is also insufficient to establish bad faith litigation.[385]

---

[382] *See Martin*, 2015 WL 6472597, at *21; *see also Nagy*, 770 A.2d at 65 ("In this case, I conclude that several of the defendants' arguments were advanced with no reasoned basis in law or logic and therefore frivolously and in bad faith.").

[383] D.I. 200 ¶¶ 8–12 ("Plaintiff and Plaintiff-Intervenors when faced with undermining facts and legal arguments have engaged in a pattern of ever changing their legal claims and allegations to suit their needs, without basis, which, in turn, has caused the Defendants to incur significant legal fees and costs.").

[384] *See, e.g.*, D.I. 259 at 50–59.

[385] *Cf. Ensing v. Ensing*, 2017 WL 880884, at *12 (Del. Ch. Mar. 6, 2017) (shifting fees due to bad faith litigation based on the presentation of sham documents).

In contrast to Lucinda, who continued to assert the Vanguard Account Counterclaim throughout trial, Plaintiffs appropriately adjusted their positions as discovery developed. Lucinda also has not shown that Plaintiffs knew that their pleadings were untrue. These crucial distinctions separate the competing allegations of bad faith litigation. The heart of Plaintiffs' claims was well-founded. Their claims were not frivolous or alleged in bad faith. And where Plaintiffs' allegations proved inaccurate, they backed away from them as the case unfolded. Lucinda has failed to carry her burden in proving that Plaintiffs engaged in bad faith litigation. Both parties will bear their own fees.

## H. Plaintiffs' Motion To Amend The Case Caption Is Granted.

Plaintiffs have moved to amend the case caption to name Defendant Lucinda A. Papa as "Lucinda A. Papa a/k/a Lucinda A. DeGroat a/k/a Lucinda A. Ziatyk."[386] Plaintiffs' motion to amend the case caption is granted.

Rule 15(a) "reflects the modern philosophy that cases are to be tried on their merits, not on the pleadings."[387] "Rule 15(a) provides that leave to amend a pleading shall be freely given when justice so requires."[388] "Leave to amend should not be granted where there is evidence of bad faith, undue delay, dilatory

---

[386] D.I. 246 at 2.

[387] *Apogee Invs., Inc. v. Summit Equities LLC*, 2017 WL 4269013, at *2 (Del. Ch. Sept. 22, 2017) (quoting *NACCO Indus., Inc. v. Applica, Inc.*, 2008 WL 2082145, at *1 (Del. Ch. May 7, 2008)).

[388] *Id.* (quoting Ct. Ch. R. 15(a)).

motive, undue prejudice or futility of amendment."[389]  A motion seeking to amend

a case caption is considered under Rule 15(a).[390]

The proposed amendment does not change the parties named in the

litigation, nor does it raise any due process concerns.[391]  The proposed amendment

seeks to alter the case caption to include names Lucinda may use to hold assets and

may have used in managing Richard's financial affairs.  Plaintiffs have established

that Lucinda has used the name Lucinda A. Ziatyk socially, was listed under that

name in her father's obituary, and has cashed checks made out to her in that

name.[392]  The evidence also establishes that Lucinda was known as Lucinda P.

DeGroat during the time she was married to Richard and was, at a minimum, listed

as the beneficiary to one of Richard's accounts under that name at one time.[393]

---

[389] *Id.* (quoting  *N.S.N. Int'l Indus., N.V. v. E.I. DuPont De Nemours & Co.*, 1994 WL 148271, at *8 (Del. Ch. Mar. 31, 1994)).

[390] *Villa v. Coburn*, 2019 WL 3769406 (Del. Ch. Aug. 9, 2019) (ORDER); *see also Doe No. 2 v. Milford Sch. Dist.*, 2011 WL 7063187, at *2 (Del. Super. Ct. Dec. 20, 2011); *Delaware Dep't of Transp. v. Mactec Eng'g & Consulting, Inc.,* 2011 WL 6400285, at *1 (Del. Super. Ct. Dec. 14, 2011).

[391] *Cf. Villa*, 2019 WL 3769406.

[392] D.I. 253, Exs. A & D.

[393] Plaintiffs seek to amend the case caption to include "a/k/a Lucinda A. DeGroat." When married to Richard, Lucinda went by the name Lucinda P. DeGroat, not Lucinda A. DeGroat.  *See* D.I. 248 at 2; *see also* JX 17 at 50–55; Tavani Tr. 77–79.  In the interest of justice, Plaintiffs' proposed amendment will be corrected to include Lucinda P. DeGroat, not Lucinda A. DeGroat.  In addition, Richard's November 8, 2011 call with Vanguard establishes that Lucinda was listed as Lucinda M. Papa on a joint account with Richard at Vanguard.  JX 17 at 51–52.  That name will also be included in the caption.

Defendants have failed to prove they will face undue prejudice from the amendment or that it is sought in bad faith. Their argument that Plaintiffs' motion "is a veiled character attack on Defendant Papa wanting to portray her as an individual with numerous aliases" is unfounded.[394] The names Plaintiffs seek to add to the case caption are the two married names Lucinda has used throughout her life, not aliases associated with cons or other criminal activity. I have not drawn any adverse inferences about Lucinda's character from her use of several names over the course of her adult life.

Justice requires an amendment to the case caption. Without an amendment, Plaintiffs may be unable to obtain an accurate accounting, and may be unable to collect a full judgment against Lucinda. Denying the proposed amendment would allow for the possibility that Lucinda may not account for financial assets she has transferred to herself or that were transferred to her under the names Lucinda M. Papa, Lucinda P. DeGroat, or Lucinda A. Ziatyk. Such a result would be inequitable and could hinder the collection of a judgment. Defendants' argument that the motion suffers from undue delay and is untimely is outweighed by the lack of prejudice, and by the effects denying the motion could have on an accurate accounting and collection of judgment.

---

[394] D.I. 248 at 4.

Plaintiffs' motion to amend the case caption is granted with modification. The case caption is amended to name Defendant Lucinda A. Papa as "Lucinda A. Papa a/k/a Lucinda M. Papa a/k/a Lucinda P. DeGroat a/k/a Lucinda A. Ziatyk."

## III.    CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiffs on all counts and counterclaims.

All transfers of Richard's assets and the re-titling of his accounts made by Lucinda from 2013 until Richard's death, with the exception of transactions related to the Vanguard TODs and Fidelity IRAs, are invalidated.

Lucinda's past accounting is declared incomplete.  To assess damages, Lucinda shall provide a new accounting of all the transactions she completed from 2013 until Richard's death as Richard's fiduciary.  Ziatyk shall also participate in the accounting to the extent he was unjustly enriched.  A constructive trust is imposed over the funds Lucinda misappropriated.

Plaintiffs' fees associated with defending the Vanguard Account Counterclaim are shifted to Defendants.  Defendants shall bear their own fees. Plaintiffs shall submit an affidavit documenting the relevant fees with the stipulated implementing order.  The parties shall submit a stipulated implementing order within twenty days.

80